IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

James R. Boughton, Jr.,                    )
    Plaintiff,                           )
                             )
v.                                         )          1:20-cv-938 (TSE/JFA)
                             )
The GEO Group Inc., <u>et al.</u>,         )
    Defendants.                          )

<u>**MEMORANDUM OPINION**</u>

James R. Boughton, Jr., ("Boughton" or "Plaintiff") a Virginia inmate, has filed a <u>pro se</u>

lawsuit under 42 U.S.C. § 1983 alleging violations of his First Amendment right to free exercise

of his religion, his Fourteenth Amendment right to equal protection, and his rights under the

Religious Land Use and Institutionalized Persons Act ("RLUIPA") while he was in custody at

the Lawrenceville Correctional Center ("LVCC"). The LVCC is operated by The GEO Group

Inc., which is named as a defendant, under a contract with the Commonwealth of Virginia. After

Plaintiff filed his first complaint in August 2020, the complaint was screened and deficiencies

were noted. Plaintiff then filed an amended complaint on June 1, 2021 (the "first amended

complaint") that alleged ten claims against nine defendants: The GEO Group Inc. ("GEO

Group"); five employees of the Virginia Department of Corrections ("VDOC") (Harold Clarke,

A. David Robinson, Bernard Morris, Melissa Welch, and Ashton Brock); and three employees

and former employees of the GEO Group (Michael Breckon, Marilyn Shaw and Jennifer

Walker). [Dkt. No. 11]. Plaintiff's claims stem from four sets of circumstances: (1) the denial of

a request to approve a religious volunteer on July 11, 2019; (2) the September 17, 2019 denial of

a request for microscope (with slides) as a religious item; (3) a failure to provide Plaintiff with

meals before a fast on February 22, 2020; and (4) an allegation that Defendants engaged in a

pattern of conduct in which the weekly meetings and special events of Plaintiff's religious group, the Nation of Gods and Earths ("NGE"), were cancelled while other religious groups were not subjected to the same pattern of conduct.

In response to Plaintiff's first amended complaint, the five VDOC employees—Defendants Clarke, Robinson, Brock, Morris, and Welch—filed motions to dismiss with supporting briefs. [Dkt. Nos. 30, 31, 34, 35]. Thereafter, Plaintiff was advised of his opportunity to file responsive materials pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K), and he then filed a motion to amend and an amended complaint on January 10, 2022. [Dkt. No. 43]. The VDOC employees' motions to dismiss were denied, without prejudice, on August 5, 2022, and the Court granted Plaintiff leave to file the January 10, 2022 amended complaint (the "second amended complaint"). [Dkt. No. 51]. On July 20, 2022, GEO Group and the three former GEO Group employees, Defendants Breckon, Shaw, and Walker, filed the motion for summary judgment currently at issue.[1] [Dkt. Nos. 48, 49]. Plaintiff was advised of his opportunity to file responsive materials pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), and Local Rule 7(K), and he filed a declaration and a brief in opposition to the motion for summary judgment. [Dkt. Nos. 53–55, 60–61]. Accordingly, the GEO Group Defendants' Motion for Summary Judgment is now ripe for disposition.

Plaintiff's second amended complaint raised the same ten claims as the first amended complaint, which may be summarized as follows with respect to the party-defendants to the Motion for Summary Judgment currently at issue:

      I.    Defendants GEO Group, Breckon, and Shaw violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution through their "enforcement of OP 027.1," a VDOC operating procedure which sets forth application requirements for religious volunteer visitors,

---

[1] The remaining defendants filed a motion to dismiss [Dkt. No. 63] that will be addressed in a separate Memorandum Opinion.

when they denied an application to serve as a religious volunteer visitor from a man known as Self Born Allah.

II.    Defendants GEO Group, Breckon, and Shaw also violated RLUIPA when they "enforce[d] OP 027.1" and denied Self Born Allah's application to serve as a religious volunteer visitor.

III.   Defendants GEO Group, Breckon, and Shaw violated the Equal Protection Clause of the Fourteenth Amendment through their "enforcement of OP 841.3(VIII)(B)" when they denied Plaintiff's request for a microscope with slides as a religious item.

IV.    Defendants GEO Group, Breckon, and Shaw also violated RLUIPA when they "enforce[d] OP 841.3(VIII)(B)" and denied Plaintiff's request for a microscope with slides as a religious item.

V.     Defendants GEO Group, Breckon, Shaw, and Walker violated the Free Exercise Clause of the First Amendment through their "denial of [Plaintiff]'s required meals to observe the NGE fast for Allah's Physical Birth."

VI.    Defendants GEO Group, Breckon, Shaw, and Walker also violated the Equal Protection Clause of the Fourteenth Amendment through their "denial of [Plaintiff]'s required meals to observe the NGE fast for Allah's Physical Birth."

VII.   Defendants GEO Group, Breckon, Shaw, and Walker violated RLUIPA through their "denial of [Plaintiff]'s required meals to observe the NGE fast for Allah's Physical Birth."

VIII.  Defendants GEO Group, Breckon, and Shaw's "pattern of cancelling NGE weekly meetings and special events establishes a pattern of behavior in violation of the Free Exercise Clause of the First Amendment of the United States Constitution."

IX.    Defendants GEO Group, Breckon, and Shaw's "pattern of cancelling NGE weekly meetings and special events establishes a pattern of behavior in violation of the Equal Protection Clause of the Fourteenth Amend of the United States Constitution."

X.     Defendants GEO Group, Breckon, and Shaw's "pattern of cancelling NGE weekly meetings and special events establishes a pattern of behavior in violation of" RLUIPA.

[Dkt. Nos. 11 at 19–22; and 43 at 28–31]. For the reasons stated below, the motion for summary will be granted in part and denied in part.

# I. Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, pursuant to Rule 56, Fed. R. Civ. P., and Local Rule 56, set forth a statement of material facts that Defendants contend are undisputed. In response, Plaintiff points out that while the material facts are largely not in dispute, the inferences that Defendants have drawn from those facts do not support summary judgment. Accordingly, the following statement of uncontested facts is derived from a review of defendants' statement of undisputed facts, Plaintiff's responses, and the record.[2]

## *Parties*

1.      Plaintiff has been in custody at LVCC since on or about September 23, 2015.

2.      Plaintiff is an adherent of the NGE religious group. [Dkt. No. 43 at ¶ 20].

3.      LVCC is operated by GEO Group under a contract with the Commonwealth of Virginia pursuant to the Corrections Private Management Act, Va. Code § 53.1-261 et seq. [Dkt. Nos. 43 at 2, 11; 49-3 at ¶ 4]. As a contract entity, LVCC follows VDOC policy regarding religious activities at the facility. [Id. at ¶ 4].

---

[2] Plaintiff submitted his own Statement of Genuine Issues of Material Facts, *see* Dkt. No. 54, but this statement fails to comply with Local Civil Rule 56(B)'s requirement that a brief in response to a motion for summary judgment "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." Plaintiff's Statement of Genuine Issues of Material Facts consists only of a list of general questions for the Court to decide (e.g., "Whether Plaintiff was discriminated against when defendants failed to provide him with [a] meal to observe NGE fast"), and does not cite to any specific factual disputes or portions of the record. For that reason, Plaintiff's Statement of Genuine Issues of Material Facts is not relied upon here. *See Essex Ins. Co. v. Y&J Constr., Inc.*, No. 15-cv-1597 (E.D. Va. Jan. 13, 2016) (Order) (Dkt. 13) (disregarding Plaintiff's "narrative statement of facts" where it did not comply with Local Rule 56(B)). Instead, the record of admissible evidence relied upon in this Memorandum Opinion includes defendants' affidavits and exhibits [Dkt. Nos. 49-1 through 49-8], and Plaintiff's sworn pleadings excluding Plaintiff's Statement of Genuine Issues of Material Facts. [Dkt. Nos. 1, 11, 43, 53, 55, and 61]. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (verified pleadings are the "equivalent of an affidavit").

4.      Defendant Michael Breckon is a former GEO Group employee who served as the warden at LVCC during the relevant time periods in 2019 and 2020. [Dkt. No. 43 at 11].

5.      Defendant Marilyn Shaw, a GEO Group employee, served as the Chief of Housing and Programs at LVCC during the relevant time periods in 2019 and 2020. [Id.].

6.      Defendant Jennifer Walker, a GEO Group employee, served as the Food Service Supervisor at LVCC during the relevant time periods in 2019 and 2020. [Id.].

*VDOC Operating Procedures*

7.      The NGE is one of several religious groups approved to operate in VDOC facilities pursuant to VDOC Operating Procedure 841.3 ("OP 841.3").[3] OP 841.3 ensures that "all recognized religious groups" at a given facility "are afforded a religious activity for group service and/or study ... and the length of the religious activity is limited not to exceed one and a half hours." Additionally, "[t]he frequency of the activity will be determined by the total number of activity requests which could result in a weekly, bi-weekly, or monthly activity." [Dkt. No. 49-3 at ¶ 5].

8.      OP 841.3 (IV)(A)(3) recognizes the security concerns within VDOC facilities and provides that "[r]eligious activities may be suspended by the Facility Unit Head based upon legitimate concerns regarding security, safety, or facility order." The regulation further provides that activities may be cancelled for "facility emergencies, lockdowns, and if there is no staff available to provide required supervision." When this occurs, the facility is not required to reschedule the activity. [Dkt. Nos. 49-3 at ¶ 6] (citing OP 841.3 (IV)(A)(3)).

9.      Lockdowns periodically occur at LVCC. The purpose of lockdowns is the interdiction of contraband that offenders have imported into the facility. During lockdowns,

---

[3] Defendants submitted a copy of OP 841.3 and its attachments titled "Approved Religious Items" and "Master Religious Calendar." [Dkt. Nos. 49-5, 49-6, and 49-7].

inmate movements are restricted to prevent circumvention of the security protocol. Lockdowns may also occur due to other factors related to the health and safety of inmates at the facility, such as lockdowns and modified lockdowns related to the COVID-19 pandemic. [Dkt. No. 49-3 at ¶ 7].

10.     During lockdowns and modified lockdowns, offenders are permitted access to approved clergy on an individual basis, are permitted to engage in personal prayers, are otherwise permitted to practice their religion on an individual basis or through approved group activities, and may participate in other activities authorized by OP 841.3. [Id. at ¶ 8].

11.     Special religious events requested by outside religious groups or organizations may be permitted to occur during lockdowns or modified lockdowns if they are requested prior to the lockdown period and the Facility Unit Head determines that the special event can occur safely and securely during the upcoming lockdown period. [Id. at ¶ 9].

*VDOC Grievance Procedures*

12.     VDOC Operating Procedure 866.1 ("OP 866.1"), titled "Offender Grievance Procedure," sets forth the institutional Grievance Procedure in place at LVCC during 2019 and 2020. [Dkt. Nos. 49-4 at ¶ 6; 49-2].[4] OP 866.1 requires that before submitting a formal grievance, which is known as a "Regular Grievance," the offender must "demonstrate that he/she has made a good faith effort to resolve the issue informally" through the procedures available at the institution. OP 866.1 (V)(B).

13.     OP 866.1 requires that the offender's initial, informal "good faith effort" to resolve the issue "shall be documented using an Informal Complaint." OP 866.1 (V)(B)(1). Prison officials' responses to Informal Complaints are "made in writing on the Informal

---

[4] The version of OP 866.1 that was in effect during 2019 and 2020 is attached to the defendants' brief. [Dkt. No. 49-2].

Complaint form," and OP 866.1 provides that the "Informal Complaint response should be returned to the office that logged it and the response forwarded to the offender." OP 866.1 (V)(E). A staff response to an Informal Complaint "shall be no longer than 15 calendar days to ensure responses are provided prior to the expiration of the 30-day time requirement for an offender to file his/her [formal] grievance." OP 866.1 (V)(C). Consequently, "[i]f 15 calendar days have expired from the date the Informal Complaint was logged without the offender receiving a response, the offender may submit a [Regular] Grievance on the issue and attach the Informal Complaint receipt as documentation of the attempt to resolve the issue informally." OP 866.1 (V)(B)(2).

14.     If the informal resolution effort fails, the offender must initiate a "Regular Grievance" by filling out the standard Regular Grievance form. OP 866.1 (VI)(A)(2). A Regular Grievance must be filed within 30 days from the date of the incident or occurrence, or the discovery of the incident or occurrence, except in instances beyond the offender's control. OP 866.1 (VI)(A)(1). When filing a Regular Grievance, "[o]nly one issue per grievance form will be addressed" and the offender must attach any required documentation of his or her "attempt to informally resolve the issue." OP 866.1 (VI)(A)(2)(a).

15.     Prior to reviewing the substance of a Regular Grievance, prison officials conduct an "Intake" review of the Regular Grievance to ensure that it meets the published criteria for acceptance. OP 866.1 (VI)(B). A Regular Grievance meeting the criteria for acceptance is logged on the day it is received, and a "Grievance Receipt" is issued to the inmate within two days. OP 866.1 (VI)(B)(3).

16.     If the grievance does not meet the criteria for acceptance, prison officials complete the "Intake" section of the grievance and return the grievance to the inmate within two

working days. OP 866.1 (VI)(B)(4). If the inmate desires a review of the intake decision, he or she must send the Regular Grievance form to the Regional Ombudsman within five calendar days of receipt. Otherwise, "[t]here is no further review of intake decisions." OP 866.1 (VI)(B)(5).

17.     If the Regular Grievance is accepted, OP 866.1 provides three possible levels of review. First, Level I reviews are conducted by the Warden or Superintendent of the prison. OP 866.1 (VI)(C)(1). If the offender is dissatisfied with the Level I determination, he or she may then appeal the determination to Level II. OP 866.1 (VI)(C)(2). Level II responses are provided by the Regional Administrator, Health Services Director, or Chief of Operations for Offender Management Services. Id. The Level II response informs the offender whether he or she "qualifies for" an appeal to Level III. OP 866.1 (VI)(C)(2)(g). Finally, if the grievance qualifies for an appeal to Level III, the Level III appeal is conducted by the Chief of Corrections Operations or Director. OP 866.1 (VI)(C)(3).

18.     Although most grievances go through the levels of review described above, OP866.1 provides that "[g]rievances regarding decisions of the Faith Review Committee" are treated differently and are "appealable to the Chief of Corrections Operations directly from Level I." OP 866.1 (VI)(C)(3)(d).

19.     Additionally, an offender may file an Emergency Grievance if the offender believes that there is a situation or condition that may subject him or her "to immediate risk of serious personal injury or irreparable harm." OP 866.1 (VII)(A). "An Emergency Grievance should be responded to within eight hours." OP 866.1 (VII)(F). "If the issue does not subject the offender to immediate risk of serious personal injury or irreparable harm, it is so indicated on the

Emergency Grievance, [and] signed with [the] date and time of response by the designated staff person." OP 866.1 (VII)(E)(2).

*Denial of Self Born Allah's Religious Volunteer Visitor Application*

20.     A man known as Self Born Allah applied to be approved as a volunteer visitor to facilitate religious observation of the tenets of the NGE faith in 2019. On or about July 11, 2019, Self Born Allah's application was denied due to his criminal conviction history. [Dkt. No. 11 at 10; Dkt. No. 11-1 at 13; Dkt. No. 49-3 at ¶ 10].

21.     VDOC Operating Procedure 027.1 provides that "[w]hen a volunteer/intern background report reveals derogatory information," the individual cannot serve as a volunteer unless the Organizational Unit Head *and* the Regional Operations Chief both approve the volunteer based on their respective determinations regarding the volunteer's impact to public safety. Self Born Allah was not approved to serve as a volunteer. [Dkt. No. 49-3 at ¶ 11 (citing OP 027.1(II)(J)(6))].

22.     On July 15, 2019, Plaintiff filed an Informal Complaint form because Self Born Allah's application had been denied. [Dkt. No. 11-1 at 13]. Defendant Shaw responded to the Informal Complaint form on July 18, 2019, explaining that Self Born Allah's "background was denied." [Id.] On July 24, 2019, Plaintiff filed a Regular Grievance. [Dkt. No. 11-1 at 11]. On July 25, 2019, the grievance was rejected at intake because the denial of the application did not affect Plaintiff "personally," and after Plaintiff appealed the intake decision, the intake decision was upheld by the Regional Ombudsman on August 5, 2019. [Id. at 12].

*Denial of Request for a Microscope with Slides*

23.     OP 841.3 provides a list of religious items that have been "approved by the Faith Review Committee" for use in VDOC facilities. [Dkt. Nos. 49-5, 49-6]. OP 841.3 also provides

9

that when an offender requests a religious object that is not on the list of approved items, the Faith Review Committee reviews the offender's request. OP 841.3(II)(C).

24.     On or about April 23, 2019, Plaintiff submitted a request to Defendant Shaw for access to a microscope with slides for religious purposes. [Dkt. No. 11-1 at 2]. Defendant Shaw "recommended disapproval based upon security concerns." [Id.]. Shaw's recommendation was then forwarded to the Faith Review Committee. [Id.]. On September 17, 2019, the VDOC Faith Review Committee sent Plaintiff notice that the Faith Review Committee had not approved Plaintiff's request for a microscope and slides because the microscope could be used as a "[p]otential weapon" as it contained "many individual parts." [Id. at 1].

25.     Plaintiff did not submit an Informal Grievance or a Regular Grievance regarding the Faith Review Committee's denial of his request for a microscope. [Dkt. No. 49 at ¶ 28; Dkt. No. 55 at 2].

*Cancellation of June 15, 2019 "Honor Day" Event*

26.     Since at least June 1, 2019, NGE has been scheduled for a weekly activity or service of ninety minutes at LVCC. [Dkt. No. 49-3 at ¶ 13].

27.     On June 15, 2019, the NGE program to celebrate "Honor Day", a religious holiday for NGE adherents, was rescheduled because a lockdown was in effect. [Dkt. No. 11-1 at 8]. All religious programs were cancelled except for special events that had been preapproved prior to the lockdown. [Id. at 10]. The Honor Day celebration was rescheduled for June 29, 2019. [Id. at 6]. A previously scheduled special religious event for another religious group that also had been cancelled was held on June 20, 2019 following approval from the Facility Unit Head. [Dkt. No. 49-3 at ¶ 14].

28.     On June 26, 2019, Plaintiff filed an Informal Complaint form regarding the cancellation of the June 15, 2019 NGE Honor Day Program. On July 1, 2019, Defendant Shaw responded to the informal complaint and stated that "all religious programs were cancelled during lockdown with the exception of special events that had been . . . approved before lockdown." [Dkt. No. 11-1 at 10].

29.     On July 10, 2019, Plaintiff filed a Regular Grievance form relating to the cancellation of the June 15, 2019 NGE Honor Day program. The Warden's office received Plaintiff's grievance on July 13, 2019. [Dkt. No. 11-1 at 8].

30.     On August 7, 2019, Defendant Breckon determined Plaintiff's Regular Grievance was unfounded because the Honor Day event had been cancelled due to a lockdown and it had been rescheduled for June 29, 2019. Brecken's decision constituted a Level I response. [Dkt. No. 11-1 at 6]. The Acting Regional Operations Chief's Level II response on August 28, 2019 upheld the Breckon's Level I response. [Dkt. No. 11-1 at 5, 6]. The Level II response stated that "Level II is the last level of appeal for this grievance. You have exhausted all administrative remedies." [Id.].

*Cancellation of January 31, 2020 NGE Weekly Service*

31.     On Friday, January 31, 2020, the regularly scheduled NGE weekly service for 8:30 a.m. was cancelled due to an institutional lockdown. [Dkt. No. 11-1 at 20]. LVCC attempted to reschedule the service at 6:30 p.m., but Plaintiff was told after 7:30 p.m. that the service had been rescheduled for the next day. The service was never held. [Dkt. No. 11-1 at 18].

32.     In response to the cancelled January 31, 2020 NGE weekly service, Plaintiff filed an Informal Complaint on February 4, 2020. [Dkt. 11-1 at 20]. Plaintiff did not receive a response to his Informal Complaint until February 27, 2020. [Id. at 19]. The response indicated

that if a weekly service is cancelled it is "not rescheduled." [Id. at 20]. OP 841.3 provides that

"[a] religious activity may be canceled for facility emergencies, lockdowns, and if there is no

staff available to provide required supervision." OP 84.1 (VI)(C). The regulation also states that

a facility is "not required to reschedule a religious activity when the activity has been cancelled

due to a facility emergency, lockdown, or shortage of staff, and that a facility "will not habitually

cancel religious activities due to shortage of staff." Id. at (VI)(C)(1)-(2).

33.     Plaintiff filed a Regular Grievance complaining about the cancelled January 31,

2020 services dated February 28, 2020[5] and marked received by the LVCC Grievance

Department on March 2, 2020. The grievance was rejected at intake because it had not been filed

within 30 days calendar days of the incident. [Id. at 16–17].

*Failure to Provide Meal Service on February 22, 2020*

34.     On February 22, 2020, Plaintiff was not provided a pre-sunrise breakfast before

the beginning of his NGE fast or a meal after the fast ended at sunset. Plaintiff states that he was

observing the fast for an NGE religious observance known as "Allah's physical birth." [Dkt. 11-

1 at 28]. Defendants state the failure to provide the meals was due to inadvertent and

unintentional oversight from the kitchen. [Dkt. No. 49-3 at ¶ 16].

35.     On February 22, 2020, Plaintiff filed an Emergency Grievance stating that he did

not receive his meal tray before sunrise so that he could observe his fast. [Dkt. 11-1 at 25]. On

February 24, 2020, Plaintiff filed an Informal Complaint. [Dkt. 11-1 at 30]. Defendant Shaw

responded to the Informal Complaint, stating "this event will be rescheduled." [Id.] Plaintiff then

---

[5] Plaintiff could have filed his Regular Grievance on February 20, 2020 after not receiving a response to his
Informal Complaint in 15 days. See OP 866.1 (V)(B)(2) ("If 15 calendar days have expired from the date the
Informal Complaint was logged without the offender receiving a response, the offender may submit a Grievance on
the issue and attach the Informal Complaint receipt as documentation of the attempt to resolve the issue
informally.").

filed a related Regular Grievance on March 19, 2020, which stated "[y]ou cannot cure this injury by rescheduling the observance of this event, because the day of Allah's physical birth and its accompanying fast has already pass[ed]." [Dkt. 11-1 at 28].

36.     On April 8, 2020, Defendant Breckon completed a Level I response to Plaintiff's Regular Grievance which stated that Plaintiff's grievance was unfounded. [Dkt. No. 11-1 at 26]. Plaintiff appealed the decision, and on April 16, a non-defendant completed a Level II response, which concludes that Plaintiff's grievance was unfounded. [Dkt. No. 11-1 at 31]. The Level II response states, "Level II is the last level of appeal for this grievance. You have exhausted all administrative remedies."[6] [Dkt. No. 11-1 at 31].

*Cancellation of March 20, 2020 Weekly Service*

37.     On March 20, 2020, the regularly scheduled NGE weekly service was cancelled due to an institutional lockdown. All programs, not just NGE's, were cancelled on March 20, 2020. [Dkt. Nos. 49-3 at ¶ 18; 11-1 at 41].

38.     On March 20, 2020, Plaintiff filed an Informal Complaint regarding the cancellation of the March 20, 2020 NGE service. [Dkt. 11-1 at 41]. Defendant Shaw responded on March 24, 2020 that "all programs [were] canceled during that time not just your program." [Id.].

39.     Plaintiff filed a Regular Grievance on March 28, 2020. [Dkt. 11-1 at 39]. Plaintiff's grievance stated that Defendant Shaw cancelled the NGE service on March 20, 2020 because counselors and unit managers were directed to assist in delivering "Holiday Packages."

---

[6] Plaintiff also filed an additional Informal Complaint and Regular Grievance in May 2020 relating to his fast on February 22, 2020. [Dkt. 11-1 at 50–55]. In those documents, Plaintiff alleges that he was treated differently from other prisoners because although he was not provided a pre-sunrise meal on February 22, 2020, Ramadan participants were provided pre-sunrise breakfast trays in May 2020. [Dkt. 11-1 at 52]. Plaintiff received a Level II response to his May 2020 grievance, which stated that Plaintiff "ha[d] exhausted all administrative remedies." [Dkt. 11-1 at 50].

[Id.] Plaintiff's grievance also stated that Defendant Shaw "continues to discriminate against [Plaintiff] and [Plaintiff's] group . . . by cancelling our weekly meeting period for non-essential matters." [Id.]. Defendant Breckon completed a Level I response on April 8, 2020, which indicated that there was no evidence of discrimination, that religious services may be cancelled if there are insufficient "staff available to provide the required supervision" or there is a "staff shortage," and that all programs were cancelled on March 20, 2020. [Id. at 37]. Regional Administrator Marcus Elam's Level II response upheld the Level I response. [Id. at 36]. The Level II response stated that Plaintiff had "exhausted all administrative remedies." [Id. at 36].

## II. Standard of Review

It is well settled that a motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim. See Celotex, 477 U.S. at 323-25. In response to such a showing, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. See id. at 324. The party who bears the burden of proving a particular

element of a claim must "designate 'specific facts showing there is a genuine issue for trial'"

with respect to that element. <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

In reviewing the record on summary judgment, the Court "must draw any inferences in

the light most favorable to the non-movant" and "determine whether the record taken as a whole

could lead a reasonable trier of fact to find for the non-movant." <u>Brock v. Entre Computer Ctrs.,</u>

<u>Inc.</u>, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary judgment stage

the judge's function is not himself to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

The non-moving party, however, must show more than some metaphysical doubt as to

the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his

pleading but must set forth specific facts showing that there is a genuine issue for trial.'" <u>Hughes</u>

<u>v. Bedsole</u>, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting <u>Anderson</u>, 477 U.S. at 256). Conclusory

allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a

scintilla of evidence will not carry this burden. <u>See</u> <u>Anderson</u>, 477 U.S. at 249-50. There must be

evidence on which the jury could reasonably find for the non-moving party. <u>Id.</u> at 252. A judge's

inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of

the evidence that the opposing party is entitled to a verdict.

When a defendant moves for summary judgment on the ground that the plaintiff lacks

evidence of an essential element of his claim, the plaintiff is required, to avoid summary

judgment, to present evidence of evidentiary quality (either admissible documents or attested

testimony, such as that found in depositions or in affidavits) demonstrating existence of genuine

issue of material fact; evidence need not be in admissible form, but it must be admissible in

content, in sense that change in form but not in content, would make evidence admissible at trial. See Celotex, 477 U.S. at 324.

### III. Exhaustion of Administrative Remedies

A threshold issue in this matter is whether Plaintiff properly exhausted his administrative remedies with respect to his various grievances before bringing this § 1983 lawsuit. The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement is mandatory," Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 677 (4th Cir. 2005) (citing Porter v. Nussle, 534 U.S. 516, 524 (2002)), and an "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. Woodford v. Ngo, 548 U.S. 81, 83-84 (2006). Exhaustion is required even if the administrative remedies do not meet federal standards, are not "plain, speedy, and effective," and even if the relief sought is not available via the grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust properly, the plaintiff must adhere to the agency's deadlines and procedural rules. Woodford, 548 U.S. at 89–90. The PLRA also requires that an inmate exhaust his administrative remedies *before* bringing a suit to challenge prison conditions. Ross v. Blake, 136 S. Ct. 1850, 1854–55 (2016) (quoting 42 U.S.C. § 1997e(a)). Finally, exhaustion of administrative remedies under the PLRA is a question of law, and "[j]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." Woodhouse v. Duncan, 741 F. App'x 177, 178 (4th Cir. 2018) (quoting Small v. Camden Cty., 728 F.3d 265, 271 (3d Cir. 2013)); see also

Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010) ("[E]xhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge.").

The exhaustion of administrative remedies for each of Plaintiff's claims is analyzed below. In short, Plaintiff properly exhausted his administrative remedies with respect to Claims I and II, Claims V through VII, and Claims VIII through X. Plaintiff failed to exhaust his administrative remedies with respect to Claims III and IV, however. For that reason, Defendant is entitled to summary judgment for Claims III and IV.

### A. Claims I and II

Claims I and II involve Plaintiff's complaint about the denial of Self Born Allah's religious volunteer visitor application. Defendant argues that Plaintiff did not file a proper Regular Grievance regarding his claim that Self Born Allah was improperly denied entry to the facility due to his background, and that Plaintiff only filed an Informal Complaint. But Plaintiff submitted as attachments to his first amended complaint documents indicating that Plaintiff did indeed exhaust his grievance related to Self Born Allah's volunteer application. [Dkt. No. 11-1 at 11–14]. Pursuant to OP 866.1, which governs the grievance procedures at LVCC, Plaintiff was required to submit both an Informal Complaint and a Regular Grievance. *See* OP 866.1(V)(B), (VI)(A)(2) [Dkt. No. 49-2 at 6–8]. Plaintiff submitted an Informal Complaint on July 15, 2019 and a Regular Grievance on July 25, 2019. [Dkt. No. 11-1 at 11–14]. On July 25, 2019, Plaintiff's Regular Grievance was rejected at intake because the denial of Self Born Allah's application did not affect Plaintiff "personally," and after Plaintiff appealed, the intake decision was upheld by the Regional Ombudsman on August 5, 2019. [Id. at 12]. The VDOC grievance procedures clearly state that if an offender desires a review of an intake decision, he must send the Regular Grievance form to the Regional Ombudsman, and that there is "no further review or

appeal of intake decisions." OP 866.1(VI)(B)(5) [Dkt. 49-2 at 8]. Thus, because Plaintiff

submitted the Regular Grievance form to the Regional Ombudsman after it was rejected at

intake, he pursued his grievance until there was no further available review or appeal. Plaintiff

therefore exhausted his administrative remedies with respect to Claims I and II.

### B. Claims III and IV

Although Plaintiff properly exhausted his administrative remedies with respect to Claims

I and II, Plaintiff failed to satisfy the exhaustion requirement with respect to Claims III and IV,

which involve Plaintiff's request for a microscope as a religious object.  After Plaintiff submitted

his request for a microscope with slides, the request was submitted to the Faith Review

Committee, which reviews requests for religious objects not included on the VDOC's list of pre-

approved objects. *See* OP 841.3(II)(C) [Dkt. No. 49-5 at 5]. The Faith Review Committee denied

Plaintiff's request due to safety concerns. [Dkt. No. 11-1 at 1]. Pursuant to the grievance

procedures at LVCC, Plaintiff was then required to submit an Informal Complaint followed by a

Regular Grievance. *See* OP 866.1(V)(B), (VI)(A)(2) [Dkt. No. 49-2 at 6–8]. Plaintiff did not

comply with OP 866.1, because Plaintiff did not file either an Informal Complaint or a Regular

Grievance after the Faith Review Committee denied his request for a microscope. Thus, because

Plaintiff failed to "make full use of the prison grievance process" and exhaust his administrative

remedies before filing this § 1983 lawsuit, Defendants are entitled to summary judgment with

respect to Plaintiff's Claims III and IV. Woodford, 548 U.S. at 94.

Seeking to avoid this conclusion, Plaintiff argues that (i) the denial of his request for a

microscope was mishandled and was given to another inmate delaying his receipt of the

response; (ii) he did not know that he could grieve the decision of the Faith Review Committee;

(iii) he was confused by "the rule" which he describes as misleading; and (iv) he was not

18

required to grieve the denial of the microscope because doing so would be redundant. [Dkt. No. 55 at 3–4]. These arguments fail to persuade.

First, even assuming, as Plaintiff alleges, that Plaintiff received the Faith Review Committee's denial of Plaintiff's request late because prison staff mishandled Plaintiff's mail, once Plaintiff *did* receive the denial, Plaintiff never attempted to file a grievance explaining that the timeliness of his grievance was beyond his control. In this respect, the VDOC grievance procedure policy explains that grievances may be submitted late where there are circumstances "[b]eyond the offender's control." OP 866.1(VI)(A)(1)(a) [Dkt. 49-2 at 7]. Plaintiff failed to avail himself of this procedure, and for that reason, Plaintiff's argument that he did not need to exhaust his administrative remedies because prison staff mishandled his mail is unpersuasive.

Second, Plaintiff's assertions that he did not know he could grieve the decision of the Faith Review Committee and that the grievance policy was confusing do not excuse his failure to exhaust administrative remedies. The Supreme Court has explained that there is no exception to the PLRA's exhaustion requirement even where "a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures." Ross, 578 U.S. at 641. Furthermore, the VDOC regulations clearly indicate that decisions of the Faith Review Committee fall within the definition of a grievable matter: OP 866.1 expressly references decisions of the Faith Review Committee and states that such decisions "are appealable to the Chief of Corrections Operations directly from Level I." OP 866.1(IV)(C)(3)(d); [Dkt. No. 49-2 at 10].

Finally, Plaintiff's argument that he did not need to appeal the decision of the Faith Review Committee through the grievance process because doing so would be redundant also fails to persuade. Both the Supreme Court and the Fourth Circuit have made clear that "a court may not excuse a failure to exhaust," even in light of "special circumstances," because under the

PLRA, "all inmates must . . . exhaust all available remedies." Ross, 578 U.S. at 640–41; see also

Moss v. Harwood, 19 F.4th 614, 621 (4th Cir. 2021) ("[G]iven the PLRA's 'mandatory

language,' there is no room to excuse a failure to exhaust all available remedies, even to take into

account 'special circumstances' that might otherwise justify compliance with procedural

requirements." (quoting Ross, 578 U.S. at 639)). Thus, Plaintiff's arguments that he did not need

to exhaust his administrative remedies must be rejected. Accordingly, Defendant is entitled to

summary judgment with respect to Claims III and IV because Plaintiff failed to satisfy the

PLRA's exhaustion requirement.

### C. Claims V, VI, and VII

Claims V, VI, and VII involve Plaintiff's allegation that he was denied a meal before

sunrise to accommodate his fast on February 22, 2020. Plaintiff twice complained about the

LVCC's failure to provide him a pre-sunrise meal on February 22, 2020.[7] Defendants admitted

in Defendants' Memorandum in Support of Motion for Summary Judgment that Plaintiff

exhausted his administrative remedies with respect to both of Plaintiff's grievances that he did

not receive meals before sunrise on February 22, 2020. [Dkt. No. 49 at ¶¶ 25, 27]. Thus, Plaintiff

has satisfied the exhaustion requirement with respect to Claims V, VI, and VII.

### D. Claims VIII, IX, and X

Finally, Claims VIII, IX, and X involve Plaintiff's allegations that Defendants had a

pattern of cancelling NGE weekly meetings and special events while allowing other groups'

---

[7] Plaintiff first filed an Emergency Complaint, Informal Complaint, and related Regular Grievance in February 2020 immediately after he was not provided a pre-sunrise meal on February 22, 2020. [Dkt. 11-1 at 25–31]. Plaintiff received a Level II response to that grievance, which stated that Plaintiff "ha[d] exhausted all administrative remedies." [Dkt. 11-1 at 31]. In May 2020, Plaintiff filed another Informal Complaint and Regular Grievance, which alleged that Plaintiff was treated differently from other offenders, because while Plaintiff was denied a pre-sunrise meal on February 22, 2020, other offenders were provided pre-sunrise meals for the observation of Ramadan in May. [Dkt. 11-1 at 50–55]. Plaintiff received a Level II response to that complaint, which also stated that Plaintiff "ha[d] exhausted all administrative remedies." [Dkt. 11-1 at 50].

events to occur. For example, Plaintiff alleges that Defendants improperly cancelled three NGE events: (i) an "Honor Day" celebration on June 15, 2019, (ii) a January 31, 2020 weekly service, and (iii) a March 20, 2020 weekly service. Plaintiff also alleges that Defendant cancelled NGE activities throughout the month of February 2020. [Dkt. No. 43 at ¶¶ 23–24].

Plaintiff has exhausted his administrative remedies with respect to his complaint that Defendants had a pattern of cancelling NGE weekly meetings. Plaintiff submitted an Informal Complaint and a Regular Grievance for both the June 15, 2019 and March 20, 2020 cancelled events. [Dkt. 11-1 at 6–10, 36–41]. Furthermore, in Plaintiff's Regular Grievances with respect to both events, Plaintiff complained that Defendants had treated his religious group differently from others. [See Dkt. 11-1 at 8, 39]. In response to each grievance, Plaintiff received a Level II reply which stated that Plaintiff "ha[d] exhausted administrative remedies." [Dkt. 11-1 at 5–6 , 36]. And Defendants admit in their Motion for Summary Judgment that Plaintiff exhausted his administrative remedies regarding the event cancellations on June 15, 2019 and March 20, 2020. [Dkt. No. 49 at ¶¶ 24, 26]. Thus, Plaintiff has clearly satisfied the exhaustion requirement with respect to his complaints that Defendants improperly cancelled NGE events on June 15, 2019 and March 20, 2020, and that in doing so, Defendants treated Plaintiff's religious group differently from other religious groups at LVCC.[8] Summary judgment is therefore inappropriate on the basis of failure to exhaust for Claims VIII, IX, and X.

---

[8] It appears that Plaintiff may not have exhausted his administrative remedies with respect to the cancelled events on January 31, 2020 and throughout the month of February. Plaintiff filed an Informal Complaint and a Regular Grievance regarding the January 31, 2020 event, but the grievance was rejected at intake because Plaintiff failed to file it within 30 calendar days of the incident. [Dkt. No. 11-1 at 16–17]. Similarly, although Plaintiff filed a grievance in February 2020, it related to Defendants' failure to provide a meal to Plaintiff, not to the cancellation of NGE events. [Dkt. No. 11-1 at 32]. Because Plaintiff exhausted his other complaints with respect to the June 15, 2019 and March 20, 2020 events, which included allegations that Defendants had a pattern of cancelling NGE events, however, Plaintiff has sufficiently satisfied the exhaustion requirement with respect to his allegations in Claims VIII, IX, and X that Defendants had a pattern of cancelling NGE events. Thus, it is not appropriate to grant summary judgment on the basis of Plaintiff's failure to exhaust for Claims VIII, IX, and X.

## IV. Analysis

Defendants argue that they are entitled to summary judgment because based on the undisputed facts, Plaintiff has failed to establish any violation of Plaintiff's rights under the Free Exercise Clause, the Equal Protection Clause, or RLUIPA. In response, Plaintiff argues that he has shown his rights were violated because other religious groups did not suffer the same deprivations he claims he has suffered. Because several of the claims in this civil action involve the same alleged facts (Claims I and II; Claims V, VI, and VII; and Claims VIII, IX, and X), those claims will be addressed together below. In short, Defendant's motion for summary judgment must be granted with respect to Claims I, II, V, VI, and VII. Defendant's motion for summary judgment must be denied without prejudice with respect to Claims VIII, IX, and X.

### A. Claims I and II

Claims I and II concern the denial of Self Born Allah's volunteer visitor application. Plaintiff alleges that Defendants' denial of Self Born Allah's application violated both the Equal Protection Clause and RLUIPA. According to Plaintiff, Self Born Allah is an "elder" of the NGE religion and that Plaintiff needs "to be taught the NGE tenets by a bonafide elder." [Dkt. No. 11 at 5; 61-1 at 2]. Plaintiff alleges that Self Born Allah's application was unfairly denied due to Self Born Allah's background and that LVCC has approved "other similarly situated individuals." [Id.] In support, Plaintiff has submitted an unsworn statement from Self Born Allah in which Self Born Allah states that he had been approved as a "volunteer visitor" for NGE members at another VDOC facility, Deerfield Correctional Center. [Dkt. No. 60-1 at 3]. Defendants have not responded to Self Born Allah's statement. Plaintiff has relied upon the same

factual allegations for Claim I and II, but because the elements of Plaintiff's equal protection claim and RLUIPA claim are different, Claims I and II are analyzed in turn below.[9]

First, Claim I alleges that Defendants' denial of Self Born Allah's volunteer application violated the Equal Protection Clause of the Fourteenth Amendment. To succeed on an equal protection claim, Plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated *and* that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001) (emphasis added). Only if a plaintiff has satisfied both of these elements of an equal protection claim will a court consider "whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

Here, Plaintiff's equal protection claim fails because Plaintiff has failed to show that any unequal treatment was the result of intentional discrimination. Even assuming that Self Born Allah's unsworn statement provides a basis to infer that Plaintiff was treated differently from other NGE members at other VDOC facilities, Plaintiff has failed to show that the disparate treatment was the result of purposeful discrimination. Nowhere in Plaintiff's sworn pleadings has Plaintiff alleged that Defendants intentionally denied Self Born Allah's application because of Self Born Allah's religion or affiliation with NGE. To the contrary, the record shows that LVCC has routinely allowed Plaintiff and other NGE members to hold services, and the prison's response to Plaintiff's grievance clearly states that Self Born Allah was denied visitor status because of his criminal history, not because of his affiliation with NGE. [Dkt. No. 11-1 at 11–13.] Moreover, Plaintiff acknowledges that Self Born Allah's application was denied due to his

---

[9] It is also appropriate to note that to the extent Plaintiff is trying to raise a claim on Self Born Allah's behalf, any such claim must fail. See Burke v. City of Charleston, 139 F.3d 401, 405 (4th Cir. 1998) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975) ("[A] plaintiff generally must assert his own legal rights and interests, and cannot assert the legal rights or interests of third parties.").

background, admits that Self Born Allah previously served fourteen years in VDOC custody, and does not allege that this was pretext for any discriminatory intent by Defendants. [Dkt. No. 43 at 15–16]. Thus, Plaintiff's equal protection claim fails because Plaintiff has failed to show that any unequal treatment was the result of intentional discrimination.

Additionally, Plaintiff's equal protection claim alleged in Claim I fails because Plaintiff has not established that any of the named defendants had any direct involvement in denying the volunteer application. To state a claim under § 1983, the plaintiff must show personal involvement by each defendant in the alleged violation of plaintiff's constitutional rights. Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (noting that liability in civil rights cases is "personal, based upon each defendant's own constitutional violations"). Plaintiff has failed to show any connection between the named defendants and the denial of Self Born Allah's volunteer application. Plaintiff relies on Shaw's response to his Informal Complaint, but Shaw's response merely states that the application was denied, not that Shaw was the person who made the decision to deny the application. [Dkt. No. 11-1 at 13]. Shaw's response to an informal complaint is not a basis for liability. See George v. Smith, 507 F.3d 605, 609-10 (7th Cir. 2007) (simply "[r]uling against a prisoner does not cause or contribute to the [constitutional] violation"); Stewart v. Beach, 701 F.3d 1322, 1328 (10th Cir. 2012) ("The 'denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.'") (citation omitted); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a prison official's "after-the-fact denial of a grievance falls far short of establishing § 1983 liability").

Indeed, under the applicable prison regulation, neither Shaw nor any of the named defendants is the final decision maker for volunteer applications. Because, as Plaintiff admits,

Self Born Allah has a felony criminal record, Self Born Allah's visitor application must undergo two levels of review: one by the "Organizational Unit Head" and then another level of review by the "Regional Operations Chief." [Dkt. 49-3 at ¶ 11]. Thus, the Regional Operations Chief is the final decisionmaker with respect to the volunteer application. But despite amending his complaint twice, Plaintiff has not included the Regional Operations Chief as a defendant or adduced any facts connecting the named defendants to the final decision by the Regional Operations Chief to deny Self Born Allah's application. Thus, because the undisputed facts indicate that the named defendants did not have personal involvement in the denial of the application, Defendants are entitled to summary judgment for Claim I.

Finally, even if the named defendants did have personal involvement in the denial of Self Born Allah's application, Plaintiff's equal protection claim still fails because the VDOC volunteer application policy is reasonably related to legitimate penological interests. The Supreme Court has long held that in the prison context, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987); see also Firewalker-Fields v. Lee, 58 F. 4th 104, 114 (4th Cir. 2023). The Fourth Circuit has explained that this "deferential standard" is applied "even when the alleged infringed constitutional right would otherwise warrant higher scrutiny" outside of the prison context, because "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." Veney v. Wyche, 293 F.3d 726, 732 (4th Cir. 2002) (quoting Morrison v. Garraghty, 239 F.3d 648, 655–56 (4th Cir. 2001)). In determining whether a policy is "reasonably related to legitimate penological interests" for purposes of an equal protection claim, the Fourth Circuit instructs district courts to look to three factors:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it." Second, a court must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Third, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation."

Fauconier v. Clarke, 966 F.3d 265, 277–78 (4th Cir. 2020) (quoting Turner v. Safley, 482 U.S. 78, 89–91 (1987)).

All three factors indicate that in this case, the VDOC policy resulting in the denial of Self Born Allah's application is reasonably related to legitimate penological interests and does not run afoul of the Equal Protection Clause. The VDOC's policy of requiring approval for volunteer applicants, and the LVCC's denial of Self Born Allah's application, is rationally related to prison security. Indeed, courts considering similar factual circumstances have on numerous occasions held that prisons do not violate the constitution when they prohibit visitors, including religious teachers, from visiting with offenders because of the visitor's criminal history. [10] Moreover, the VDOC policy does not prohibit *other* NGE elders from being approved for volunteer religious designation at LVCC, and other religious volunteers are subject to the same application requirements as Self Born Allah. See Benjamin v. Coughlin, 905 F.2d 571, 578 (2d Cir. 1990) (a prison requirement does not violate equal protection because if it has a legitimate basis and is imposed on all religious groups); see also Overton v. Bazzetta, 539 U.S. 126, 132 (2003) (concluding that "[a]n inmate does not retain rights inconsistent with proper incarceration," and that "freedom of association is among the rights least compatible with incarceration"); Jones v.

---

[10] See, e.g., Pippins v. Adams County Jail, 851 F. Supp. 1228, 1234 (C.D. Ill. 1994) (explaining that a prison official's refusal to permit a minister to visit an inmate satisfies Turner's standard because "obvious prison concerns dictate against allowing paroled felons to meet with" inmates); Johnson-Bey v. Lane, 863 F.2d 1308, 1310 (7th Cir. 1988) (explaining that a prison need not permit "convicted felons, frocked or unfrocked, to conduct religious services in the prison"); Roseboro v. Gillespie, 791 F. Supp. 2d 353, 372 (S.D.N.Y. 2011) ("[I]t is obvious that regulating visits from individuals with criminal backgrounds is essential to prison discipline and order."); Malone v. Caruso, 470 F. App'x 501, 502 (6th Cir. 2012) (wife's visiting privileges denied based on her status as a felon); Hicks v. Erie County, 65 F. App'x 746, 749 (2d Cir. 2003) (policy excluding paralegals with felony convictions from privileged access in the prison "was a lawful policy" that did not violate the Constitution).

N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 126 (1977) ("The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution"). Thus, the denial of Self Born Allah's application did not violate the Equal Protection Clause, and Defendants' motion for summary judgment on Claim I must be granted.

Claim II alleges that the denial of Self Born Allah's volunteer application violated RLUIPA. This claim also fails to survive summary judgment. To state a claim under RLUIPA, a prisoner must show that he takes part in a religious exercise and that the State's actions have substantially burdened that exercise. Lovelace v. Lee, 472 F.3d 174, 182 (4th Cir. 2006). If the prisoner satisfies those elements, then the State must prove that its actions were the least restrictive means of furthering a compelling governmental interest. Id. Thus, pursuant to this analysis, Plaintiff bears the initial burden of establishing that his religious exercise was substantially burdened. 42 U.S.C. § 2000cc-1(a). A "substantial burden" occurs under RLUIPA if a prison policy "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or ... forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion ... on the other hand." Lovelace, 472 F.3d at 187. Importantly, RLUIPA is not meant "to elevate accommodation of religious observances over an institution's need to maintain order and safety." Cutter v. Wilkinson, 544 U.S. 709, 722 (2005); see also Couch v. Jabe, 679 F.3d 197, 201 (4th Cir. 2012). For that reason, RLUIPA does not give prisoners an unfettered right to religious accommodations, Id. at 723–26, and an inmate does not suffer a substantial burden just because the prison fails to provide all the religious accommodations he desires. For example, in this respect, the Eighth Circuit has explained that prisoners do not have

a right to the religious advisor of their choice. Blair-Bey v. Nix, 963 F.2d 162, 163-64 (8th Cir. 1992).

Here, Plaintiff has failed to satisfy his initial burden of showing that the denial of Self Born Allah's visitor application substantially burdened Plaintiff's religious exercise. Plaintiff argues that the denial of Self Born Allah's volunteer application has denied him the opportunity to become properly educated "in NGE tenets, NGE history, 120 Lessons, and NGE dietary law." [Dkt. No. 55 at 6]. But Plaintiff's affidavits [Dkt. No. 60-1 at 1–2, 4–7] establish, at best, only that he would not have the assistance of his *particular* desired NGE elder—Self Born Allah— and not that LVCC would deny him the assistance of *any* religious teacher. Indeed, as Plaintiff does not dispute, it was Self Born Allah's criminal background that disqualified him, and there is nothing in the record to indicate that Self Born Allah was denied because he was associated with NGE or that LVCC would deny other NGE visitor applicants. RLUIPA does not require that the prison provide Plaintiff with the "religious advisor of [his] choice." Turner, 836 F. App'x at 230; see also Blair-Bey, 963 F.3d at 164 ("Nor does the Constitution require that prisoners be provided the religious advisor of their choice."). Furthermore, Plaintiff does not contest the defendants' position that he can obtain his stated religious education objectives through correspondence or through other NGE religious authorities. [Dkt. No. 58 at 4]. Indeed, Plaintiff has many other available means to engage in his religious exercise, including communicating with Self Born Allah via mail or phone, [11] identifying other NGE elders to apply for visitor

---

[11] Plaintiff admits that he communicated with Self Born Allah "in early 2019," which establishes that he has a viable means of communication with Self Born Allah even though Self Born Allah's request for volunteer status was denied. [Dkt. Nos. 11 at 20; 43 at 15]. To be sure, Plaintiff was able to obtain Self Born Allah's statement to file as part of his response in this civil action, demonstrating that Plaintiff has the ability to communicate with Self Born Allah even if he is not approved as a visitor. [Dkt. No. 60-1 at 3]. See Rowe v. Ind. Dep't of Corr., No. 1:11cv524, 2014 U.S. Dist. LEXIS 123884, *18 (S.D. Ind. 2014) (where inmate could contact the pastor who had been denied visitation privileges by mail and phone, inmate failed to establish he had been substantially burdened under RLUIPA or the Free Exercise Clause).

status, or obtaining religious texts or study materials.[12] See Shabazz v. Johnson, 2015 WL 4068590, at *8 (E.D. Va. July 2, 2015) ("[C]ourts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden."). Thus, Plaintiff has not established that the denial of Self Born Allah's volunteer application placed a substantial burden on his practice of his religion in violation of RLUIPA. For that reason, Defendant is entitled to summary judgment for Count II.

### B. Claims V, VI, and VII

Claims V, VI and VII concern Defendants' alleged failure to provide Plaintiff with a meal before sunrise on February 22, 2020 prior to his fast in observance of Allah's Physical Birth. Plaintiff argues that the denial of the pre-sunrise meal violates the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and RLUIPA. In response, Defendants admit that Plaintiff was not provided a meal before sunrise prior to the

---

[12] Plaintiff is not limited in learning about the NGE to a single NGE elder, and there are several readily available books and other publications concerning NGE that cover NGE beliefs, NGE history, the "120 Lessons," and NGE dietary law that provide an alternative. On one website alone, the following are among the books that are available: John Ali, III, *120 Degree Lessons: The Knowledge of Self For The Black Man*; John Stinson, *The Nation of Gods and Earths*; God Supreme Allah, *Supreme Lessons of the Gods and Earths: A Guide for 5 Percenters to Follow As Taught by Clarence 13x Allah*; and Pen Black, *GODS, EARTHS and 85ers*. See https://www.amazon.com/ (search "Nation of Gods and Earths") (last viewed on Jan. 11, 2023). In addition, the facility Chaplain for LVCC in certain circumstances is authorized to "assist the offender with obtaining religious texts, study materials, etc. for their religion." VDOC OP 841.3(V)(A)(2)(B).

beginning of his NGE fast in February 2020, but state that it was an isolated incident[13] "due to inadvertent and unintentional oversight from the kitchen." [Dkt. No. 49-3 at ¶ 16].

Plaintiff's Free Exercise Clause, equal protection, and RLUIPA claims all fail at the outset because Plaintiff has not shown that any of the named defendants intentionally discriminated against Plaintiff in denying Plaintiff's asserted "right to fast." [Dkt. No. 11-1 at 28]. The Supreme Court and Fourth Circuit have made clear that claims under the First Amendment, Fourteenth Amendment, and RLUIPA all require a showing that the defendant's alleged actions were intentional. See Wall v. Wade, 741 F.3d 492, 500 n.11 (4th Cir. 2014) ("[F]or the plaintiff to ultimately succeed [on RLUIPA and First Amendment claims] . . . he must still prove that the defendants' actions were intentional."); Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977) (refusing to find an equal protection violation based solely on discriminatory results alone; intent is required). This is so because, as the Fourth Circuit has explained, "[a]llowing negligence suits to proceed under RLUIPA would undermine . . . deference [to the experience of prison administrators] by exposing prison officials to an unduly high level of judicial scrutiny." Lovelace, 472 F.3d at 194.

---

[13] Plaintiff denies that this was an isolated incident, stating for the first time in his response to Defendants' Motion for Summary Judgment that Plaintiff was also denied a "bag lunch" for Allah's Physical Birth on February 22, 2019. [Dkt. No. 53 at 2]. But Plaintiff cannot amend his claim by raising new matters in a response to a motion. See Hurst v. District of Columbia, 681 F. App'x 186, 194 (4th Cir. 2017) ("a plaintiff may not amend her complaint via briefing"); Campbell ex rel. Equity Units Holders v. Am. Int'l Grp., Inc., 86 F. Supp. 3d 464, 472 (E.D. Va. 2015) ("[I]t is axiomatic that [a] complaint may not be amended by the briefs in opposition to a [dispositive] motion"). Furthermore, according to VDOC regulations, even assuming Plaintiff was denied a "bag lunch" in February 2019, that would mean he also received the pre-sunrise meal and the post-sunset meal on that day because the regulation requires all three meals be provided. [Dkt. No. 49-7 at 1] (copy of OP 841.3, Attachment 4). And in any event, it is also not clear from the response if any of the defendants were employees in February 2019 or were responsible the preparation of meals in February 2019.

Here, the undisputed facts make clear that Defendants acted only negligently in failing to provide Plaintiff with his requested meals[14] on the date of his fast. To begin with, none of the named Defendants other than Walker appear to have been involved in the failure to provide Plaintiff with a pre-sunrise meal at all. Plaintiff has asserted that Defendant Shaw "denied him his right to fast." [Dkt. No. 11-1 at 28], but Shaw's involvement was limited to responding to Plaintiff's Informal Complaint. [Dkt. No. 11-1 at 30]. As noted previously, the "denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983." Stewart, 701 F.3d at 1328. Instead, the only defendant that has any connection with food service at LVCC is Defendant Walker, who Plaintiff alleges failed to provide Plaintiff's food at the required times for Plaintiff's fast. [Dkt. No. 43 at 12, 21-22]. But the undisputed facts make clear that Walker's failure to provide Plaintiff with a pre-sunrise meal was an inadvertent and unintentional act. Defendants state in their Statement of Undisputed Material Facts that "[o]n February 22, 2020, Boughton was not provided a breakfast before sunrise prior to the beginning of his NGE fast . . . due to inadvertent and unintentional oversight from the kitchen." [Dkt. No. 49 at ¶ 16]. Plaintiff does not contest this fact in his responses to Defendants' Motion for Summary Judgment, nor has Plaintiff cited any fact in the record indicating that the denial of his pre-sunrise meal was anything other than a negligent mistake. In Plaintiff's Declaration, he states that the denial of his pre-sunrise meal was "not an isolated incident," but nowhere does Plaintiff allege that the denial

---

[14] Plaintiff's allegations are inconsistent about whether Defendants failed to provide only one prescribed meal or multiple meals on the day of Plaintiff's fast. In his original complaint, Plaintiff did not allege he had not received any meals on February 22, 2020, only that he had not received them at the "prescribe[d] time." [Dkt. No. 1 at 9]. In the first amended complaint, Plaintiff alleged that he was deprived of only "his breakfast meal," which he alleged denied him his right to observe the fast. [Dkt. No. 11 at 16]. In the second amended complaint, Plaintiff alleged that he was deprived of "meals." [Dkt. No. 43 at 18]. In his informal complaint, Plaintiff complained that he had not received his "breakfast tray" on or about 4:50 a.m. so that he could "observe the fast." [Dkt. No. 11-1 at 30]. The Court, however, will assume for purposes of this motion that Plaintiff did not receive the required meals on February 22, 2020 at the prescribed times.

was intentional. [Dkt. No. 53 at ¶ 10]. In fact, in one of Plaintiff's grievances, Plaintiff himself stated that the prison "staff was *negligent*" in failing to provide the meals at the prescribed times. [Dkt. No. 11-1 at 21] (emphasis added). Thus, Plaintiff has not pointed to any facts indicating that Defendant acted intentionally in failing to provide Plaintiff's meals on February 22, 2020. For that reason, Defendants are entitled to summary judgment on Claims V, VI, and VII.

Seeking to avoid this conclusion, Plaintiff points out that although Walker failed to provide Plaintiff with a pre-sunrise meal in February 2020, Walker later fulfilled her duties to provide pre-sunrise meals to other prisoners during Ramadan in May 2020. [Dkt. No. 55 at 2; Dkt. No. 11-1 at 33–35]. This argument fails to persuade. The fact that Walker, after failing to provide meals for a religious fast on one occasion, did so successfully on subsequent occasions, does not by itself support an inference of intentional or purposeful discrimination. Simply being more diligent after making a mistake does not equate with intentional discrimination. Furthermore, Plaintiff has not presented any evidence to challenge Defendants' admission that the failure to provide the meals to him on February 22, 2020 was an inadvertent and unintentional act, nor has Plaintiff explained how he was prevented from observing his fast (from sunrise to sunset) when he alleges he was not provided food. Thus, Plaintiff's argument that Walker intentionally discriminated against him fails, as the record makes clear that Walker's failure to provide the proper meals for Plaintiff's fast was a negligent, isolated mistake.

Moreover, Plaintiff's Free Exercise Clause and RLUIPA claims fail for the additional reason that Plaintiff has failed to establish that Plaintiff's missed meals on February 22, 2020 created a substantial burden on Plaintiff's practice of religion. In order to succeed on either a First Amendment or RLUIPA claim, a plaintiff has the initial burden of establishing that a prison policy substantially burdens his ability to practice in accordance with a sincerely held religious

belief. Greenhill v. Clarke, 944 F.3d 243, 250 (4th Cir. 2019). Here, Plaintiff states that "NGE adherents observe[d] a fast from sunup to sundown" on February 22, 2020 in observance of Allah's Physical Birth. [Dkt. No. 43 at 18]. But it is not clear how the prison's failure to provide meals at the prescribed times on one day impacted Plaintiff's ability to fast between sunrise and sunset. Plaintiff never explains how he was denied a right to fast when he was not provided the prescribed meals, and he has not alleged that he was somehow forced to eat during the period of sunrise to sunset on February 22, 2020 or punished for refraining to eat. In any event, missing one morning meal and one evening meal does not establish a substantial burden on Plaintiff's practice of his religion sufficient for an RLUIPA or free exercise claim. Instead, the deprivation of the meals for a single day, in a manner that did not prevent Plaintiff from observing the fast, is at best an isolated event that does not give rise to a constitutional claim in this § 1983 suit. In this regard, federal courts have repeatedly held that such isolated events involving a denial of religiously-mandated food do not give rise to First Amendment or RLUIPA claims.[15] Thus, Plaintiff's failure to adduce any facts to support that the denial of meals on February 22, 2020 substantially burdened his religious beliefs provides another reason why Defendants' Motion for Summary Judgment must be granted for Claims V and VII.

---

[15] See, e.g., Mbonyunkiza v. Beasley, 956 F.3d 1048, 1054 (8th Cir. 2020) ("[T]here is extensive (but not total) agreement that an isolated, intermittent, or otherwise de minimis denial or interruption of an inmate's religiously required diet does not substantially burden his religious beliefs."); Gallagher v. Shelton, 587 F.3d 1063, 1070 (10th Cir. 2009) (allegations of isolated, negligent acts with respect to prisoner's receipt of kosher diet did not state a First Amendment claim); Rapier v. Harris, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (unavailability of pork-free meals on three out of 810 occasions consisted only a de minimus burden on prisoner's religion and did not violate the Free Exercise Clause); Shango v. Jurich, 681 F.2d 1091, 1104 (7th Cir. 1982) ("'isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.' Such incidents demonstrate, at most, a 'mere inconsistency in prison management ... which ... may not in itself constitute a cognizable equal protection claim.'"); Watkins v. Donnelly, 551 F. App'x 953, 960-61 (10th Cir. 2014) (denial of religious meals three times in one day was de minimis burden on free exercise rights); Norwood v. Strada, 249 F. App'x 269, 272 n.1 (3d Cir. 2007) (denial of religiously certified halal meals on seven occasions during a prison lockdown was a "mere de minimis intrusion" that failed to substantially burden inmate's religious beliefs).

In conclusion, because the record does not establish any intentional discrimination or that the missed meals created a substantial burden on Plaintiff's practice of his religion, Defendant's Motion for Summary Judgment must be granted with respect to Claims V, VI, and VII.

### C. Claims VIII, IX, and X

Claims VIII, IX, and X allege that Defendants had a "pattern of cancelling NGE weekly meetings and special events," which Plaintiff argues constitutes a pattern of behavior that violates Plaintiff's right to equal protection, his rights under the Free Exercise Clause, and RLUIPA. In his second amended complaint, Plaintiff relies upon what he characterizes as "the continuous cancellation of NGE weekly meetings and Honor Day special events." [Dkt. No. 55 at 7]. Plaintiff cites the cancellation on January 31, 2020, which was cancelled due to a staff shortage when "holiday packages" were handed out; a lockdown in effect from February 14, through February 25, 2020; weekly meetings and activities cancelled in February 2020 due to COVID-19; and his grievance that the NGE services were cancelled on March 20, 2020 in order for holiday packages to be handed out. [Dkt. Nos. 11-1 at 39; 55 at 8].[16]

In response, Defendants argue that the events cancelled were due to staffing shortages and institutional lockdowns. Plaintiff acknowledges that the events were cancelled for staffing shortages and lockdowns but has averred that not all religious programs were cancelled, that other faith groups were permitted to hold events, and that NGE events appear to have been targeted by Defendants because the staffing shortages were scheduled in advance and always occurred on Friday mornings at the same time as the scheduled NGE weekly meetings. [Dkt. No. 43 at 20-21]. Defendant's Motion for Summary Judgment does not address these allegations by Plaintiff that Defendants had a pattern of cancelling NGE events while allowing other religious

---

[16] The second amended complaint references the January 31, 2020 and March 20, 2020 weekly event cancellations. [Dkt. No. 43 at 17, 17-18].

events to proceed. Furthermore, Plaintiff's allegations are not simply that his religious meetings and events were canceled; Plaintiff alleges that Defendants, particularly defendant Shaw, intentionally scheduled certain events that cause staff shortages in a manner that unfairly impacted NGE adherents, and that greater accommodations were made for other faith groups during the lockdowns. [Dkt. No. 43 at 20-21]. Defendants have failed to address sufficiently these facts alleged by Plaintiff. For example, Plaintiff alleges that Defendant Shaw "possessed a wide latitude of discretion" in scheduling faith groups, and that Defendant Shaw "habitually cancelled" NGE meetings "for the distribution of holiday packages," while allowing other groups' religious programs to occur. [Dkt. No. 43 at 20–21].[17] Furthermore, Defendants' motion does not dispute Plaintiff's sworn statement that NGE weekly services were targeted and that greater accommodations were made for other faith groups when a lockdown causes the cancellation of services. [Id.]. Consequently, because Defendants have failed to address these allegations by Plaintiff, the motion for summary judgment will be denied without prejudice as to Claims VIII, IX, and X. Defendants will be permitted to file a second motion for summary judgment or other appropriate dispositive motion with respect to Claims VIII, IX, and X within thirty days of the entry of this Memorandum Opinion.

---

[17] The record does not explain what "holiday packages" are; how often they are handed out; who picks the date and time for distribution; whether the handouts always occur on Fridays (and if so why); how long it takes to hand out the packages; why the handouts occur in the mornings; what accommodations have been made for NGE adherents for the cancelations (and if none, why); and who makes decisions related to the handouts. The record also does not establish that other religious groups were not treated any differently from NGE. Any further dispositive motion should address these matters and the like matters involving the lockdowns and cancellation of NGE events.

## V. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted with respect to Claims I through VII and denied without prejudice with respect to Claims VIII, IX, and X. An appropriate Order will issue alongside this Memorandum Opinion.

February 9, 2023
Alexandria, Virginia

/s/

T. S. Ellis, III
United States District Judge