## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| James R. Boughton, Jr., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20cv938 (TSE/JFA) |
| | ) | |
| The Geo Group Inc., et al., | ) | |
|     Defendants. | ) | |

### MEMORANDUM OPINION

James R. Boughton, Jr., ("Boughton" or "Plaintiff") a Virginia inmate, has filed a pro se civil action under 42 U.S.C. § 1983 alleging violations of his right to equal protection, his First Amendment right to free exercise of his religion, and his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") while he was in custody at the Lawrenceville Correctional Center ("LVCC"). In his second amended complaint, Plaintiff raised ten claims and named nine defendants: The Geo Group Inc. ("GEO Group"); five employees of the Virginia Department of Corrections ("VDOC") (Harold Clarke, A. David Robinson, Bernard Morris, Melissa Welch, and Ashton Brock); and three employees of the GEO Group (Michael Breckon, Marilyn Shaw and Jennifer Walker). [Dkt. No. 43]. On February 9, 2023, the Court issued two Memorandum Opinions. [Dkt. No. 75, 77]. The first concerned the claims raised against the GEO Group and its employees. The Court granted summary judgment on Claims I through VII, and denied the motion for summary judgment without prejudice with respect to Claims VIII, IX, and X. [Dkt. No. 76]. In the second Memorandum Opinion, which concerned the VDOC employees, the Court granted defendants Clarke and Robinson's motion to dismiss with respect to all ten claims; denied defendant Brock's motion to be dismissed as a defendant; granted

defendants Morris, Welch, and Brock's motion to dismiss with respect to Claims I, II, IV, V, VI, and VII; and denied their motion to dismiss Claim III.

Now before the Court is a motion for summary judgment filed by defendants GEO Group, Breckon, Shaw, and Walker, which is supported by a brief and affidavit. [Dkt. Nos. 85, 86].[1] Plaintiff was advised of his opportunity to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) and Local Rule 7(K), and he sought an extension of time that was granted. [Dkt. Nos. 88, 89]. On April 24, 2023, Plaintiff filed a Declaration in Opposition to the Motion for Summary Judgment, a Statement of Genuine Issues of Material Facts, and a Response to defendants' motion. The defendants seek summary judgment on the three remaining claims:

> (1) Defendants … GEO Group, Breckon, and Shaw's "pattern of cancelling NGE weekly meetings and special events establishes a pattern of behavior in violation of the Free Exercise Clause of the First Amendment of the United States Constitution." (Count VIII)
>
> (2)     Defendants … GEO Group, Breckon, and Shaw's "pattern of cancelling NGE weekly meetings and special events establishes a pattern of behavior in violation of the Equal Protection Clause of the Fourteenth Amend of the United States Constitution." (Count IX)
>
> (3)     Defendants … GEO Group, Breckon, and Shaw's "pattern of cancelling NGE weekly meetings and special events establishes a pattern of behavior in violation of the" RLUIPA. (Count X)

[Dkt. No. 43 at 30-31].

## I. Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a

---

[1] Defendants Brock, Morris, and Welch have also filed a motion for summary addressing Claim III [Dkt. Nos. 80, 81], which will be addressed in a separate memorandum opinion.

statement of material facts that defendants contend are undisputed. In response, Plaintiff has

admitted several of the undisputed facts and where Plaintiff attempts to dispute an asserted fact

he rarely points to any evidence or any portion of the record that disputes the facts set out in the

defendants' memorandum of law. [Dkt. No. 91 at 9-10].[2] The failure to cite to record evidence

means that no genuine dispute has been raised. See Hadeed v. Abraham, 265 F. Supp.2d 614,

620 n. 19 (E.D. Va. 2003); Taylor v. CNA Corp., 782 F.Supp.2d 182, n. 1 (E.D. Va. 2010)

(holding where a nonmovant fails "to cite evidence in the record to dispute those facts, the facts

… identified are taken as true"). Plaintiff, as "the non-moving party 'may not rest upon mere

allegation or denials of his pleading but must set forth specific facts showing that there is a

genuine issue for trial.'" Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995).[3] Accordingly,

---

[2] The record of admissible evidence includes the affidavits and exhibits [Dkt. Nos. 49-1 through -8] previously filed, the affidavit at Dkt. No. 86-1, and Plaintiff's sworn pleadings. [Dkt. Nos. 1, 11, 43, 53, 54, 55, 61, 91]. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (verified pleadings are the "equivalent of an affidavit"). In his response to the VDOC defendants' statement of undisputed facts, Plaintiff now seeks to deny several facts to which he has already sworn to under oath. Such facts, however, are deemed admitted. "[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004); see Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07 (1999) ("A party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity"). Where a party seeks to create a genuine issue of fact by contradicting the party's own sworn statements, a district court may disregard the affidavit in determining whether a genuine issue of material fact exists. Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991).

[3] After the Roseboro notices were sent by the defendants, Plaintiff attempted to engage in discovery with the defendants, as evidenced by the defendants' motion to stay discovery. [Dkt. No. 93]. Plaintiff, however, has filed his several responses and has not filed a declaration indicating he needs further discovery, requested a motion to compel, or otherwise sought discovery from the Court. Plaintiff had already filed 70 pages of exhibits with the original complaint [Dkt. Nos. 1-1 through 1-14], 59 pages of exhibits with the first amended complaint [Dkt. No. 11-1], three additional exhibits in response to the first motion for summary judgment [Dkt. Nos. 73-1 through 73-3]; and an additional exhibit in response to the second motion for summary judgment [Dkt. No. 91-1]. The Court has considered and reviewed all of his exhibits in connection with the motion for summary judgment.

Further, as is evident from the record, this is the second round of dispositive motions in this civil action and Plaintiff is familiar with the process. In his response to the motion for summary judgment, Plaintiff has not argued any need for discovery or questioned the adequacy of the summary judgment record. Nor has Plaintiff filed any objection or opposition to the defendants' motion for a stay. The Court is aware of the Fourth Circuit's recent opinion in Shaw v. Foreman, 59 F.4th 121 (4th Cir. 2023). There, the Fourth Circuit held that "the district court was on fair notice of potential disputes as to the sufficiency of the summary judgment record. Id. at 129. For the reasons explained above, though, the reasoning of Shaw is not applicable in this case, and the Court will not delay consideration of the defendants' motion for summary judgment. It is also not the case that Plaintiff cannot present facts to justify his

the following statement of uncontested facts is derived from a review of defendants' statement of

undisputed facts, Plaintiff's responses, and the record.

1.      Plaintiff has been in custody at LVCC since on or about September 23, 2015.

2.      Plaintiff is an adherent of the Nation of Gods and Earths ("NGE") religious group.

[Dkt. No. 43 at ¶ 20].[4]

3.      LVCC is operated by GEO Group under a contract with the Commonwealth of

Virginia pursuant to the Corrections Private Management Act, Va. Code § 53.1-261 et seq. [Dkt.

Nos. 43 at 2, 11; 49-3 at ¶ 4].[5] As a contract entity, LVCC follows VDOC policy regarding

religious activities at the facility. [Id. at ¶ 4].[6]

4.      The NGE is one of several religious groups approved to operate in VDOC

facilities pursuant to VDOC Operating Procedure 841.3 ("OP 841.3").[7] OP 841.3 provides that

"all recognized religious groups" at a given facility "are afforded a religious activity for group

service and/or study ... and the length of the religious activity is limited not to exceed one and a

---

opposition, see, e.g., Pledger v. Lynch, 5 F.4th 511, 526 (4th Cir. 2021), because, as seen herein, he has denied facts to which he has actually sworn to under oath. See, e.g., infra at notes 6, 10.

[4] Plaintiff "disputes" that NGE is a religion but does not reconcile his dispute with his assertions that his First Amendment rights of free exercise of religion have been violated and his assertion of a claim under RLUIPA. For purposes of this motion, the Court will use the phrase "religious group," which is consistent with the manner in which other courts have categorized NGE. See Coward v. Robinson, 276 F. Supp. 3d 544, 566 (E.D. Va. 2017) (observing fifteen states had found that NGE was a religion and finding the "plaintiff has carried his burden of proving that the NGE is a religion").

[5] Although not set forth in the current summary judgment pleadings, the Court previously found it was undisputed that during the relevant time periods of 2019 and 2020: Defendant Breckon is a former GEO Group employee who served as the warden at LVCC; Defendant Shaw, a GEO Group employee, served as the Chief of Housing and Programs at LVCC; and Defendant Walker, a GEO Group employee, served as the Food Service Supervisor at LVCC. [Dkt. No. 43 at 11].

[6] Plaintiff has "denied" this fact but ignores that he made, essentially, the same factual allegation under oath in his first amended complaint, and again in his second amended complaint. [Dkt. Nos. 11 at 8; Dkt. 43 at 2, 11] ("The GEO Group is under contract with VADOC in charge of operating LVCC ... and is legally responsible for housing during confinement, maintaining sanitary living conditions, fair treatment and providing operations for rehabilitation by way programs and faith based groups while confined at LVCC.").

[7] The defendants submitted a copy of the relevant version of OP 841.3 and the attachments showing Religions Approved to Operate in VDOC Facilities, Approved Religious Items, and a Master Religious Calendar. [Dkt. Nos. 49-5, -6, and -7].

half hours." Additionally, "[t]he frequency of the activity will be determined by the total number of activity requests which could result in a weekly, bi-weekly, or monthly activity." [Dkt. No. 49-3 at ¶ 5].

5.       OP 841.3 (IV)(A)(3) recognizes the security concerns within VDOC facilities and provides that "[r]eligious activities may be suspended by the Facility Unit Head based upon legitimate concerns regarding security, safety, or facility order." The regulation further provides that activities may be cancelled for "facility emergencies, lockdowns, and if there is no staff available to provide required supervision." When this occurs, the facility is not required to reschedule the activity. [Id. at ¶ 6] (citing OP 841.3 (IV)(A)(3)). However, "[f]acilities will not habitually cancel religious activities due to a shortage of staff." [Dkt. No. 49-5 at 12].

6.       Lockdowns periodically occur at LVCC. Generally, the purpose of lockdowns is the interdiction of contraband that has infiltrated the facility. During lockdowns, inmate movements are restricted to prevent circumvention of the security protocol. Lockdowns may also occur due to other factors related to the health and safety of inmates at the facility. An example of this is a lockdown and modified lockdown related to the COVID-19 pandemic. [Dkt. No. 49-3 at ¶ 7].[8]

---

[8] Plaintiff disputes this fact stating that "Governor Northam declared a state of emergency in Virginia in March 2020," and that "[l]ockdowns were habitually implemented at LVCC due to staff shortages." [Dkt. No. 91 at 9]. Plaintiff does not establish the alleged relevance of the statewide lockdown, which did not prohibit the warden or the director from taking their own action. Further, Plaintiff does not explain what he means by "habitually," and he has not pointed to any evidence in the record to support his assertion. The amended complaint only lists four lockdown dates: January 31, 2020 and March 20, 2020, to deliver holiday packages; June 15, 2019, Honor Day ("The Show and Prove"), which was rescheduled to June 29, 2019; and February 14, 2020 through February 23, 2020, which covered "Allah's Physical Birth" day, February 22, 2020. [Dkt. No. 43 at 17-18, 24, 25].

Plaintiff also disputes that the defendants' affiant, D.D. Hicks, has firsthand knowledge of the information contained in his affidavit. [Dkt. No. 91 at 3]. Hicks was a Unit Manager at LVCC during the times relevant to the amended complaint, as Plaintiff admits, and Hicks had knowledge of the matters addressed in the affidavit: VDOC regulations regarding religious organizations; the purpose of lockdowns; what types of religious practice are allowed during lockdowns; the reason for any lockdown exceptions; and the reasons for lockdowns on June 15, 2019, January 31, 2020, the month of February 2020, and March 20, 2020; and holiday package distribution procedures.

7.      During lockdowns and modified lockdowns, inmates are permitted access to approved clergy on an individual basis, are permitted to engage in personal prayers, are otherwise permitted to practice their religion on an individual basis or through approved group activities, and other activities authorized by OP 841.3. [Id. at ¶ 8].

8.      Special religious events requested by outside religious groups or organizations may be permitted to occur during lockdowns or modified lockdowns if they are requested prior to the lockdown period and the Facility Unit Head determines that the special event can occur safely and securely. [Id. at ¶ 9].[9]

9.      Since at least June 1, 2019, the NGE has been scheduled for a weekly activity or service for ninety (90) minutes at LVCC. [Dkt. Nos. 49-3 at ¶ 13; 86-1 at ¶ 9].[10]

10.     On June 15, 2019, the NGE program to celebrate "The Show and Prove" day or Honor Day— a religious holiday for NGE adherents —was cancelled because of a quarterly lockdown to search for contraband. [Dkt. No. 11-1 at 8, 10; Dkt. No. 86-1 at ¶ 7]. All religious programs were cancelled on June 15, 2019 and "The Show and Prove" day program was rescheduled for June 29, 2019. [Id. at 6]. A previously scheduled special religious event for another religious group was held on June 20, 2019 following approval from the Facility Unit Head. [Dkt. No. 49-3 at ¶ 14]. The rescheduled event held on June 20, 2019 involved an outside volunteer who had been approved prior to the lockdown to enter the facility for purpose of

---

[9] Plaintiff denies this fact but has pointed to no evidence in the record upon which he relies. [Dkt. No. 91 at 9].

[10] Plaintiff denies this fact but he has submitted no evidence to the contrary nor pointed to any evidence in the record upon which he relies. [Dkt. No. 91 at 9]. Indeed, in his sworn first amended complaint Plaintiff states that "NGE is scheduled to receive one weekly meeting for 90 minutes every Friday morning at LVCC." [Dkt. No. 11 at 12]; see also Dkt. No. 55 at 8.

conducting the event, and the event was allowed to occur based on the facility's prior commitment to the approved visitor. [Dkt. No. 11 at 14; Dkt. No. 86-1 at ¶ 11].[11]

11.     On Friday, January 31, 2020, the regularly scheduled NGE weekly service for 8:30 a.m. was cancelled due to an institutional lockdown to distribute holiday packages. [Dkt. Nos. 49-3 at ¶ 15; 86-1 at ¶¶ 12, 16; 11-1 at 20; Dkt. No. 91 at 5, ¶ 33]. LVCC attempted to reschedule the service at 6:30 p.m., but Plaintiff was told, after 7:30 p.m., that the service had been rescheduled for the next day, Saturday, February 1, 2020. The service was never held. [Dkt. No. 11-1 at 18]. Plaintiff filed an Informal Complaint on February 5, 2020, but did not receive a response until February 27, 2020. [Id. at 19]. The response indicated that, if a weekly service is cancelled, it is "not rescheduled." [Id. at 20]. OP 841.3 provides that "[a] religious activity may be canceled for facility emergencies, lockdowns, and if there is no staff available to provide required supervision." OP 84.1 (VI)(C). The regulation also states that a facility is "not required to reschedule a religious activity when the activity has been cancelled due to a facility emergency, lockdown, or shortage of staff," and that a facility "will not habitually cancel religious activities due to shortage of staff." Id. at (VI)(C)(1)-(2).

12.     On February 22, 2020, and throughout the month of February, LVCC was on lockdown due to the onset of the COVID-19 pandemic. All programs, not just NGE's, were cancelled due to this lockdown. [Dkt. No. 86-1 at ¶ 13].[12]

---

[11] Plaintiff's only apparent dispute is the use of the phrase "Honor Day." [Dkt. No. 91 at 9].

[12] Plaintiff disputed this fact but again he neither submitted evidence to dispute the point nor did he point to evidence in the record upon which he relied. [Dkt. No. 91 at 10].

13.     On March 20, 2020, the regularly scheduled NGE weekly service was cancelled due to an institutional lockdown. All programs, not just NGE's, were cancelled on March 20, 2020. [Dkt. Nos. 49-3 at ¶ 18; 86-1 at ¶ 14; 11-6 at 41].[13]

14.     During lockdown periods, instances of staff shortages, and other security restrictions affecting religious programs, all religious groups are affected equally. That is, regular religious programs during those times are restricted. Often this results in the cancellation of religious programs during the affected time periods. Special religious events may still occur if they meet the criteria described above. [Dkt. No. 86-1 at ¶ 15].[14] See, supra at ¶ 8.

15.     During January and February 2020, the facility periodically received "holiday packs" for inmates. Approximately 75 percent of the approximately 1650 inmates receive these packages. When they arrive, the facility prioritizes distributing the holiday packages to inmates because: the inmates are eager to receive them; and the facility avoids retaining holiday packs for an extended period because there is a heightened risk that they will be stolen. [Id. at ¶ 16].

16.     When holiday packages arrive, therefore, they are distributed as soon as possible. Typically, this occurs the same day. To facilitate the distribution of holiday packages, inmates are temporarily locked down. Holiday packages for each housing unit are brought where the respective inmates are housed. The correctional officers then call the inmates out one at a time to receive their holiday packages. This process is very taxing of staff resources at the facility. During these lockdown periods, all programs are cancelled. [Id. at ¶ 17].

---

[13] Plaintiff attempts to dispute this fact by asserting that other programs were allowed to continue as scheduled in the afternoon and by his further assertion that the NGE was habitually targeted. Plaintiff's argument is conclusory. [Dkt. No. 91 at 10]. He does not name any program that was allowed to continue, and he neither submitted evidence to dispute the point nor did he point to evidence in the record upon which he relied. See also, supra at note 8.

[14] Plaintiff disputes the final four paragraphs of the statement of facts by simply stating "denied." [Dkt. No. 91 at 10]. Again, he neither submitted evidence to dispute the points nor did he point to evidence in the record upon which he relied.

8

17.     The timing of the distribution of holiday packages is driven by when they are received. There is no set schedule for when holiday packages arrive at the facility. Consequently, there is no specific day of the week that holiday packages are distributed. Thus, the programs affected by the delivery of holiday packages are those programs that happen to be scheduled at the time they are received. The facility does not discriminate against any particular religious programs when these temporary lockdown periods occur. The affected programs are not a criteria for determining when these periodic lockdowns occur. [Id. at ¶ 18].[15]

## II. Standard of Review

It is well settled that a motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim.

---

[15] Plaintiff argues that the facility knows when the packages are going to arrive based upon an unauthenticated order form and invoice regarding a package for another inmate. The invoice is allegedly issued by a company named Access Securepak. The Securepak invoice is dated August 3, 2022 and a line of the invoice is labeled "Schd Ship Date" and the date indicated is September 15, 2022. [Dkt. 91-1 at 1]. Even if authenticated, the invoice is outside the relevant time frame of the second amended complaint and does not indicate that anyone at LVCC has any advanced notice as to when a package will arrive. Consequently, there is no advance notice upon which the facility could determine when to lockdown to arrange to deliver the packages. In addition, the VDOC "Order Form included with the invoice does not provide a specific guaranteed delivery date. The form states that "Delivery to facility: approximately 1-2 weeks after order placement." [Id. at 2]. In short, the invoice and order form do not dispute the facts averred in the affidavit submitted by the defendants. To the contrary, the "1-2 weeks" language in the order form supports the defendants' affiant's assertion that the facility does not know when the packages will arrive.

9

See Celotex, 477 U.S. at 323-25. In response to such a showing, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist that must be resolved at trial. See id. at 324. The party who bears the burden of proving a particular element of a claim must "designate 'specific facts showing there is a genuine issue for trial'" with respect to that element. Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." Brock v. Entre Computer Ctrs., Inc., 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The non-moving party, however, must show more than some metaphysical doubt as to the material facts. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial.'" Hughes, 48 F.3d at 1381 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 256). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. See Anderson, 477 U.S. at 249-50. There must be evidence on which the jury could reasonably find for the non-moving party. Id. at 252. A judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the opposing party is entitled to a verdict.

When a defendant moves for summary judgment on the ground that he plaintiff lacks
evidence of an essential element of his claim, plaintiff is required, if he wants to ward off grant
of the motion, to present evidence of evidentiary quality (either admissible documents or attested
testimony, such as that found in depositions or in affidavits) demonstrating existence of genuine
issue of material fact; evidence need not be in admissible form, but it must be admissible in
content, in sense that change in form but not in content, would make evidence admissible at trial.
See Celotex, 477 U.S. at 324. Hearsay "is neither admissible at trial nor supportive of an
opposition to a motion for summary judgment." Greensboro Professional Firefighters Ass'n v.
City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995). Such "second-hand" information learned
from others fails to satisfy a plaintiff's burden "to survive a motion for summary judgment."
Monk v. Potter, 723 F. Supp. 2d 860, 875, 878 (E.D. Va. 2010) (citing Greensboro, 64 F.3d at
967; Riggs v. Airtran Airways, Inc., 497 F.3d 1108, 1121 (10th Cir. 2007) (noting statements
conveyed to plaintiff were "second-hand" and inadmissible hearsay in opposition to summary
judgment); Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 89-90 (D.D.C. 2006)
(purported events related by plaintiff in her own deposition were based on second-hand
information rather than personal knowledge and were therefore inadmissible hearsay for
summary judgment purposes); Fed. R. Civ. P. 56(e) (supporting or opposing summary judgment
affidavits must be based on "personal knowledge")).

Claims VIII through X allege the defendants' engaged in a "pattern of cancelling NGE
weekly meetings and special events establishes a pattern of behavior" that violates Plaintiff's
rights under the Free Exercise Clause of the First Amendment (Claim VIII), equal protection
(Claim IX), and RLUIPA (Claim X). Plaintiff characterizes the defendants' pattern of behavior
as "the continuous cancellation of NGE weekly meetings and Honor Day special events." [Dkt.

11

No. 55 at 7]. Plaintiff asserts the following cancellations form the basis of his claims: (1) the cancellation on January 31, 2020, which was cancelled due to a staff shortage when holiday packages were handed out; (2) a lockdown was in effect during February 2020 that resulted in the cancellation of an Honor Day on February 22, 2020; (3) weekly meetings and activities cancelled in February 2020 due to COVID-19, even though the Governor did not did not declare an emergency until mid-March of 2020; and (4)his grievance that the NGE services were cancelled on March 20, 2020 in order for holiday packages to be handed out. [Dkt. Nos. 11-1 at 39; 55 at 8].[16]

The undisputed facts establish that since at least June 1, 2019, NGE has been scheduled for a weekly activity or service for ninety (90) minutes at LVCC, [Dkt. Nos. 49-3 at ¶ 13; 86-1 at ¶ 9].[17] The undisputed factual record also establishes that a total of eight NGE religious services or programs have been cancelled over approximately a ten-month period due to administrative cancellations. The defendants argue that the events were cancelled due to staffing shortages and institutional lockdowns. Plaintiff acknowledges that the events were cancelled for staffing shortages and lockdowns but asserts that NGE events were targeted. [Dkt. No. 43 at 20-21]. Plaintiff's argument fails.

*A. Free Exercise (Claim VIII)*

The Fourth Circuit has held that "[t]o make a Free Exercise claim, a prisoner must first show, as a threshold matter, that a prison practice or regulation violates his Free Exercise rights before showing that the prison's policies are not 'reasonably related to legitimate penological

---

[16] The second amended complaint references the January 31, 2020 and March 20, 2020 weekly event cancellation; and the February 22, 2020 cancelation of Allah's Physical Birth celebration. [Dkt. No. 43 at 17, 17-18].

[17] As noted, in his sworn first amended complaint, Plaintiff admitted that "NGE is scheduled to receive one weekly meeting for 90 minutes every Friday morning at LVCC." [Dkt. No. 11 at 12]; see also Dkt. No. 55 at 8.

interests.'" Firewalker-Fields v. Lee, 58 F.4th 104, 114 (4th Cir. 2023) (quoting Ali v. Dixon, 912 F.2d 86, 89 (4th Cir. 1990) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)). To make a threshold showing, a plaintiff

> must show (1) that he holds a sincere religious belief and (2) that his religious practice has been substantially burdened by the prison policy or practice. Greenhill v. Clarke, 944 F.3d 243, 253 (4th Cir. 2019). A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or following his beliefs and losing some government benefit. Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006).

Firewalker-Fields, 58 F.4th at 114. The defendants do not challenge the sincerity of Plaintiff's beliefs, but argue that Plaintiff has failed to establish that the cancelling of religious services was a substantial burden.

NGE adherents practice their beliefs individually and collectively. Collectively "NGE adherents practice their beliefs by attending civilization classes and group meetings called ciphers or parliaments, as well as by observing honor (holy) days." Coward v. Robinson, 276 F. Supp. 3d 544, 553 (E.D. Va. 2017).[18] NGE adherents have central texts and other texts and periodicals, which they study individually. The Coward Court summarized several of the aspects of individual and collective aspects of NGE.

- Central texts to NGE adherents include: the 120 Degrees or the Supreme Wisdom Lessons; the Supreme Mathematics ("which attaches a value such as 'wisdom' or 'understanding' to each number"); the Supreme Alphabets

---

[18] Plaintiff makes several references to Coward in his second amended complaint. [Dkt. No. 43 at 13-15]. Coward discusses NGE and noted there are four honor days that NGE adherents observe:

> Allah's (Clarence 13X's) Birthday, which the NGE calls Father's Day, is celebrated on February 22 and is marked by fasting and communal reflection on Allah's legacy. Show and Prove Day, which is celebrated on or around June 13, is an opportunity for NGE adherents to show and prove that Allah lives on through them by showcasing their gifts and talents at a community picnic. On the third honor day, the Annual Family Day Event/Allah Social, which is celebrated on the last Saturday in August, NGE adherents gather and invite friends and family members to join in their festivities. The last honor day, called Day One, is celebrated on October 10 when NGE adherents commemorate the birth of the NGE by reflecting on the history of the NGE and dressing in their traditional colors of black and gold with men wearing Kufis and women wearing head wraps or Galas.

Coward, 276 F. Supp. 3d at 553-54.

("which gives a meaning such as 'Allah' or 'justice' to each letter of the alphabet"); and "the 12 Jewels, which are the values of knowledge, wisdom, understanding, freedom, justice, equality, food, clothing, shelter, love, peace, and happiness."

- NGE adherents also study The Bible and the Qur'an, but they are "not considered central texts."

- "Other relevant literature includes periodicals, such as the Five Percenter newspaper."

- "NGE adherents are required to engage in daily study of their foundational texts to gain a deeper understanding of their 'divine nature and ... relationship with life and the universe.'"

- "Individual NGE adherents often compile their personal interpretations of the foundational texts in a collection referred to as the 'Book of Life.'"

Coward, 276 F. Supp. 3d at 552-53.[19] The cancellation of the eight Friday meetings, therefore, did not deny Plaintiff the ability to individually practice his religion by studying the various texts, etc. mentioned in Coward. The cancellations of the eight meetings only limited his collective practice.

In examining the eight meetings, as well as the reason each was cancelled, there is no pattern or evidence of intent to cancel NGE activities as alleged and Plaintiff has not pointed to any evidence in the record to refute the legitimacy of the lockdowns for administrative reasons and COVID-19. The June 15, 2019 cancellation was due to a quarterly lockdown to search for contraband; the January 31, 2020 lockdown was characterized as an "institutional lockdown," and the parties agree it was for the distribution of holiday packages; the February 2020 cancellations were due to COVID-19 restrictions. Finally, the March 20, 2020 cancellation was due to the distribution of holiday packages. Four administrative cancellations over a nine month period, with irregular time periods seven months to less than one month, do not establish a

---

[19] The list is not exhaustive but establishes that NGE' adherents have collective and individual pursuits. Coward, 276 F. Supp. 3d at 553-54. In addition, Plaintiff acknowledges that NGE adherents' practice "NGE tenets collectively or individually." [Dkt. No. 91 at 1].

14

"pattern or practice," see, e.g., Oliver v. Powell, 250 F. Supp. 2d 593, 604 (E.D. Va. 2002) (opening plaintiff's legal mail outside his presence on two occasion does note establish prison officials made opening legal mail outside the inmate's presence a pattern or practice and the "plaintiff's claim does not rise to the level of a constitutional violation."). A pattern or practice is "something more than random or sporadic discriminatory acts," rather it is a policy that "systematically engages in intentional discrimination against a protected group." Sperling v. Hoffman-La Roche, 924 F. Supp. 1346, 1357, 1358 (D.N.J. 1996).[20]

Further, even though Plaintiff has not established the alleged pattern of cancellation was targeted at NGE, he has also not established that the eight cancellations constituted a substantial burden on his practice of NGE. As Coward notes, there is a substantial individual aspect of NGE that Plaintiff was free to pursue on the eight days the meetings were cancelled.

A prisoner's constitutional right to freedom of religion is not violated by the occasional inability to attend services. See Green v. McKaskle, 788 F.2d 1116, 1126 (5th Cir. 1986) (where inmate was prevented by circumstances from attending an occasional service, the prison provided the inmate "a reasonable opportunity to practice his religion"). Thus, Plaintiff did not meet his burden of showing that the occasional cancellation of NGE services over a nearly ten-month period violated his rights under the First Amendment or substantially burdened his right of free exercise. See Diaz v. Collins, 114 F.3d 69, 71-72 (5th Cir. 1997); See, e.g., Williams v. Bragg, 537 F. App'x 468, 468-69 (5th Cir. 2013) (holding plaintiff did not establish substantial burden on his religious exercise by "occasional cancellation of Muslim services"); White v. Labrado, 51 F. App'x 929, 929 (5th Cir. 2002) (per curiam) (no substantial burden under

---

[20] "'[A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature.'" Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336

Religious Freedom Restoration Act to deny two-week period of Jewish religious services); see, e.g., Dellinger v. Clarke, 172 F. Supp. 3d 898, 903 (W.D. Va. 2016) (granting summary judgment because inmate did not "allege that missing the five cancelled services put substantial pressure on him to modify his behavior and violate his beliefs"). Lastly, Plaintiff could pursue the individual aspects of NGE on the days meetings were cancelled. See Hamilton v. Schriro, 74 F.3d 1545, 1551 (8th Cir.1996) (no constitutional violation when inmate has alternative means, including prayer, for practicing religion); see, e.g., Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 983 (8th Cir. 2004) ("A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so" and "although he cannot participate in group worship, as a solitary practitioner [the inmate] can still study the scriptures and ... materials, pray, occasionally meet with ... clergy, observe holy days, and worship in other ways").

Even assuming that Plaintiff had made a threshold showing of a substantial burden, however, he cannot prevail on his Free Exercise claim because he cannot carry his burden to prove that the prison's policies were unreasonable, given the deference due prison officials, under the four factors set forth in Turner v. Safley, 482 U.S. 78, 89 (1987):

> (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives."

Greenhill v. Clarke, 944 F.3d 243, 253 (4th Cir. 2019) (quoting Turner, 482 U.S. at 89-91).

Here, there is a rational connection between the religious services being cancelled to allow for the search for contraband; to protect the health of inmates and staff at the beginning of

16

the COVID-19 pandemic when little was known about COVID-19;[21] and to facilitate the distribution of the holiday packages, which involved a large number of staff. On the days the NGE meetings were cancelled, NGE adherents, such as Plaintiff, were not prohibited from practicing the individual components of NGE. The third factor, impact on inmates and staff, also weighs in favor of the defendants. The lockdowns were necessary to ensure staff were able to search for contraband and distribute the large number of packages associated with the holiday package distributions without having to control the activities of prisoners outside of their cells. Further, the initial COVID-19 response was necessary in order to formulate a protocol to address the unprecedented situation presented by the pandemic and control the spread of the virus among not only staff, but the prison population as well. Lastly, there is no alternative to an institution-wide lockdown to conduct a systematic search for contraband, a large-scale distribution of packages, or to address the potential spread of a communicable virus in an institutional setting. Because Plaintiff cannot show that there was a substantial burden on his ability to practice his religion or show that LVCC's polices were unreasonable, he cannot establish a Free Exercise claim. Accordingly, the defendants' motion for summary judgment will be granted as to Claim VIII.

*B. Equal Protection (Claim IX)*

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made,

---

[21] See Doney v. Uttecht, No. 4:20cv5156, 2022 U.S. Dist. LEXIS 35010, *14 (E.D. Wa. Feb. 28, 2022) ("the spread of the novel COVID-19 pandemic [wa]s also relatively unprecedented, particularly in light of the changing landscape the virus caused ... due to new variants, the substantial reduction in prison staff who become infected, and the initial limited availability of vaccines" and the suspension of some religious activities "for a period of months during the early stages of the COVID-19 pandemic" by the defendant "was reasonably related to the legitimate penological interests of maintaining the health and safety of prisoners and staff alike.").

the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001) (citations omitted). In the prison context, "courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner" and the court "must determine whether the disparate treatment is 'reasonably related to [any] legitimate penological interests.'" Veney v. Wyche, 293 F.3d 726, 732 (4th Cir. 2002) (quoting Morrison, 239 F.3d at 655, 656; Shaw v. Murphy, 532 U.S. 223, 225 (2001)); see Desper v. Clarke, 1 F.4th 236, 248-49 (4th Cir. 2021) (quoting Fauconier v. Clarke, 966 F.3d 265, 277 (4th Cir. 2020)) (plaintiff "must also plausibly allege that 'the disparity was not justified under the appropriate level of scrutiny,' which, in the prison context, means that he 'must allege that the disparate treatment was not reasonably related to any legitimate penological interests.'"). Ordinarily, a regulation or policy will be presumed to be valid and will be sustained if the classification is rationally related to a legitimate state interest. Morrison, 239 F.3d at, 654– 55 (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985)). "Because courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform ... a prison regulation that impinges on inmates' constitutional rights ... is valid if it is reasonably related to legitimate penological interests and not an exaggerated response to a particular concern." Id. Once an inmate makes the initial threshold showing, courts consider four factors in Turner to determine if the challenged prison regulation is constitutional under the Equal Protection Clause. Id. at 655 (citing Turner, 482 U.S. at 89-90).

With regard to disparate treatment, the undisputed facts on the summary judgment record do not establish that NGE was treated any differently than any other religious group. Although all religious meetings were cancelled on June 15, 2019, one religious groups' service, which

18

involved an outside volunteer who had been preapproved for the event, was rescheduled for June 20, 2019 while the NGE event was rescheduled for June 29, 2019. While each was not rescheduled on the same date, each was rescheduled. In February 2020, four NGE meetings were cancelled due to the onset of the COVID-19 in February 2020 but LVCC cancelled all programs that month. [Dkt. No. 86-1 at ¶ 13]. The same is true for the holiday package lockdowns that occurred on January 31, 2020 and March 20, 2020. Plaintiff has not established NGE was treated any differently than any other religious group on the eight dates services or meetings were cancelled. Thus, Plaintiff cannot make a threshold showing of disparate treatment as necessary to make an Equal Protection claim.

Even assuming *arguendo,* the Plaintiff has met the threshold showing (which he has not), he has not established that the lockdowns were not "reasonably related to legitimate penological interests and not an exaggerated response to a particular concern." <u>Morrison</u>, 239 F.3d at, 654-55. First, Plaintiff does not challenge the need for the lockdowns on any of the eight occasions that the NGE meetings were cancelled and implicitly concedes that there was a rational connection between the decision (cancelling services on the eight occasions cited) and a penological interest. Instead, Plaintiff seeks to prove that NGE was treated differently than another religious group by alleging a pattern of cancelling NGE weekly meetings and special events, which he characterized as "the habitual cancellation of NGE programs." [Dkt. No. 91 at 2]. Plaintiff's reliance on eight cancellations over a ten-month period, five of which were during the onset of COVID-19 pandemic in February 2020, does not qualify as the habitual cancellation of NGE programs and does not establish a pattern of behavior. Further, as noted, it does not establish the necessary disparate treatment required to prove an equal protection claim.

As other courts have recognized "the spread of the novel COVID-19 pandemic [wa]s also relatively unprecedented, particularly in light of the changing landscape the virus caused ... due to new variants, the substantial reduction in prison staff who become infected, and the initial limited availability of vaccines." Doney, 2022 U.S. Dist. LEXIS 35010, *14.[22] In Doney, the district court found that the "suspension of access to the prison sweat lodge and smudge pad for a period of *months* during the early stages of the COVID-19 pandemic" by the defendant "was reasonably related to the legitimate penological interests of maintaining the health and safety of prisoners and staff alike." Id. at *14 (emphasis added).

In sum, the summary judgment record does not show any disparate treatment and that LVCC personnel had a valid reason for the lockdowns that resulted in the cancellation of NGE's programs, as well as other religious groups services, on the eight dates alleged in the second amended complaint. Moreover, LVCC attempted to accommodate NGE by rescheduling one of the eight dates and attempting to reschedule another; but there was no ready alternative available. Plaintiff can neither show disparate treatment nor a lack of reasonable penological interest. Thus, his Equal Protection claim fails. The defendants' motion for summary judgment on Claim IX will be granted.

### C. RLUIPA (Claim X)

RLUIPA claims are analyzed under the strict scrutiny standard and are to be construed "'in favor of broad protection of religious exercise.'" Lovelace, 472 F.3d at 186 (quoting 42 U.S.C. § 2000cc-3(g)). To state a claim under RLUIPA, a plaintiff must plead that "he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is

---

[22] See, e.g., Slidewaters LLC v. Washington State Dep't of Labor and Industries, 4 F.4th 747, 752 (9th Cir. 2021) (describing COVID-19 as "a novel, potentially deadly, severe acute respiratory illness" that, despite restrictions by state governments "to curb the transmission of the virus[,]" has led to the infection of approximately 114.6 million people in the United States and over 600,000 deaths).

subject to a substantial burden imposed by the government." <u>Abdulhaseeb v. Calbone</u>, 600 F.3d 1301, 1316 (10th Cir. 2010). The inmate bears the initial burden of showing that a prison's policy creates a substantial burden on his religious exercise. If he makes such a showing, the burden shifts to the defendant to show that its policy furthers a compelling state interest by the least restrictive means. 42 U.S.C. § 2000cc-2 (b). "In particular, the government must prove that the burden in question is the least restrictive means of furthering a compelling governmental interest." <u>Lovelace</u>, 472 F.3d at 186.

With respect to what constitutes a substantial burden, the Fourth Circuit provided straight forward guidance in <u>Incumaa v. Stirling</u>, 791 F.3d 517 (4th Cir. 2015).

> A prison regulation may impose a "substantial burden" by forcing "a person to 'choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand.'" <u>Lovelace v. Lee</u>, 472 F.3d 174, 187 (4th Cir. 2006) (alterations in original) (quoting <u>Sherbert v. Verner</u>, 374 U.S. 398, 404 (1963)). In other words, the regulation places the person between a rock and a hard place.

<u>Incumaa</u>, 791 F.3d at 525. The Fourth Circuit added that "a substantial burden is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs or one that forces a person to choose between following the precepts of [their] religion and forfeiting governmental benefits, on the one hand, and abandoning the precepts of [their] religion on the other hand." <u>Greenhill</u>, 944 F.3d at 250 (citing <u>Lovelace</u>, 472 F.3d at 187 (4th Cir. 2006)).

<u>Incumaa</u>'s provides practical guidance on how to analyze whether a situation involves a substantial burden is demonstrated by its discussion of the grooming policy in <u>Couch v. Jabe</u>, 679 F.3d 197 (4th Cir. 2012). In <u>Couch</u>, the inmate claimed his religious beliefs required him to grow a one-inch beard, which violated prison policy—a policy enforced by the removal or denial of benefits. 679 F.3d at 199. The district court in <u>Incumaa</u> held that the practice at issue in <u>Couch</u> "'fit squarely within the accepted definition of substantial burden' because it forced the inmate to

21

choose between following the edicts of his religion and losing privileges." 791 F.3d at 525 (quoting Couch, 679 F.3d at 199). Here, Plaintiff has not alleged that the sporadic cancellation of religious events forced him to choose between following the edicts of his religion and abandoning one of NGE's precepts. Thus, Plaintiff cannot establish a substantial burden.

In this matter, there are two different categories of reasons for cancelling the meetings: administrative and the onset of the COVID-19 pandemic. There were three dates upon which meetings were cancelled for administrative reasons. On June 15, 2019, there was a lockdown that was part of LVCC's plan to combat contraband that makes its way into the prison which requires limiting all inmate movement to allow for a complete search of the facility. Courts recognize the legitimacy of such a purpose.[23] The next administrative cancellation occurred approximately seven months later on January 31, 2020, and Plaintiff has not questioned that there was a legitimate need for an institutional lockdown on January 31, 2020. The last administrative cancellation was on March 2020 in order to facilitate the facility wide distribution of holiday packages, which requires reassigning staff to move and deliver packages to individual inmates throughout LVCC. The expediency of delivering the packages to the inmates is two-fold. First, the longer the packages are stored the greater the chance of theft. The second is inmate morale because inmates look forward to the packages. Each of these purposes implicate institutional safety.

---

[23] See Florence v. Bd. of Chosen Freeholders, 566 U.S. 318, 332 (2012) ("Detecting contraband concealed by new detainees, furthermore, is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail."); Hudson v. Palmer, 468 U.S. 517, 528 (1984) ("The uncertainty that attends random searches of cells renders these searches perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband."); Block v. Rutherford, 468 U.S. 576, 588-589 (1984) (in the context of contact visitation the Court took "judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country."); Bell v. Wolfish, 441 U.S. 520, 559 (1979) ("A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.").

There are no alternative plans that allows for such administrative activities to take place. A search for contraband is not effective unless the mobility of all of the inmates is restricted. Likewise, where staff need to be temporarily reassigned to other duties, the staffing reallocations involve the preeminent concern of institutional safety both to staff as well as inmates. Such situations decrease the ability to supervise inmates and increase the opportunities for inmates to interfere with interdiction or engage in other inappropriate conduct (*i.e.*, assaults on other inmates or theft) if their mobility is not restricted.

The second category of cancellation, COVID-19, involved four Friday meetings and the Honor Day on February 22, 2020. The appearance of COVID-19 is a unique incident for which the United States, as well as other countries, were not prepared. United States v. Salley, Criminal Case No. 19-688, 2020 U.S. Dist. LEXIS 87373, *7 (E.D. Pa. Apr. 28, 2020). As each day passed during 2020, officials responsible for the safety of inmates were provided with more information on the spread and progression of COVID-19 in populations.

> The issue of COVID-19 spread is exponentially more pressing in a prison. "Spread is more likely when people are in close contact with one another (within about 6 feet)." Even people without symptoms can infect others. While most of the country socially distances to avoid community spread, incarcerated persons cannot follow the Center for Disease Control's guidelines to mitigate the spread of the virus and face a heightened risk of contagion. Correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons [and] staff[.]"

Salley, Criminal Case No. 19-688, 2020 U.S. Dist. LEXIS 87373, *7. (footnotes omitted). LVCC officials were trying to ensure the safety of their staff and the inmates in their custody, which included Plaintiff as well. In sum, for February 2020, there was no viable alternative for LVCC or the defendants to pursue and thus Plaintiff cannot make out a RLUIPA claim based on these administrative cancellations.

Here, the counsel provided by Couch is of great value.

> Although RLUIPA must "be construed in favor of a broad protection of religious exercise," 42 U.S.C. § 2000cc-3(g), it must be applied "with particular sensitivity to security concerns," Cutter v. Wilkinson, 544 U.S. 709, 722 (2005). In this regard, *"RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety."*

Couch, 679 F.3d at 201 (emphasis added). The Cutter court continued holding "that an accommodation must be measured so that it does not override other significant interests." Id. The changing landscape of COVID-19 in February 2020, and still today, demonstrates that stopping the spread of it in February 2020 was indeed a significant interest. Prison administrators are afforded deference due to their "'experience and expertise … in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" Lovelace, 472 F.3d at 190 (quoting Cutter, 544 U.S. at 723)). Here, cancelling all programs during February 2020, given the novel and evolving nature of COVID-19, was the least restrictive means available to the defendants to ensure the safety of their staff and the inmates at LVCC.

In sum, the defendants have sporadically locked down LVCC on four occasions outside of February 2020. In each instance, they have tried to reschedule and Plaintiff has not been prohibited from pursuing the individual aspects of NGE. See, supra at 13-14. Plaintiff admits the defendants have made attempts on several occasions to reschedule events, and he has not provided evidence that the there was any viable alternative administrative decision The defendants' motion for summary judgment on Claim X will therefore be granted.

24

## V. Conclusion

For the foregoing reasons, defendants' motion for summary judgment [Dkt. No. 85] is granted with respect to Claims VIII through X; and the motion to stay discovery [Dkt. No. 93] is denied as moot. An appropriate Order will issue alongside this Memorandum Opinion.

Entered this _6th_ day of _____July_____, 2023.

Alexandria, Virginia

_____
T. S. Ellis, III
United States District Judge